HOME WARRANTY CORPORATION, Home Owners Warranty Corporation, and HOW Insurance Company, Plaintiffs,

v.

David H. ELLIOTT, Insurance Commissioner of the State of Delaware, Defendant.

Civ. A. No. 83–230–WKS.

United States District Court, D. Delaware.

Sept. 22, 1983.

■■■■■■■■■■■■■■

Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., Hamilton H. Boykin, Peter C. Schaumber, Gerald F. Ivey, Esquire, Colton & Boykin, Washington, D.C., Terence S. Cooke, HOW Insurance Company, Washington, D.C., for plaintiffs.

Catherine S. Mulholland, Regina Mullen, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

Home Warranty Corporation, Home Owners Warranty Corporation, and HOW Insurance Company ("plaintiffs" or "HOW") brought this action against David Elliott, Insurance Commissioner of the State of Delaware ("the Commissioner"), seeking injunctive relief and a declaratory judgment that HOW Insurance Company is a "risk retention group" under the provisions of the Product Liability Risk Retention Act of 1981, 15 U.S.C. § 3901 *et seq.* ("the RRA" or "the Act"). Cross-motions for summary judgment have been briefed and argued and are now ripe for decision.

## I. BACKGROUND

Home Warranty Corporation is a mutual company owned by builders of new homes who participate in the Home Owners Warranty program ("the HOW program"). Home Warranty Corporation is the sole stockholder of the Home Owners Warranty Corporation, which administers the HOW program and owns HOW Insurance Corporation. HOW Insurance provides what plaintiffs claim to be product liability insurance for the home builders who own the Home Warranty Corporation.

Plaintiffs claim that HOW Insurance Corporation qualifies as a risk retention group under the provisions of the RRA and is, therefore, entitled to the benefit of the Act's preemption of state law. The Commissioner disagrees. He claims that HOW Insurance is not a risk retention group as defined by the RRA and has directed it not to use its filing with his office as authority to operate on an interstate basis as a risk retention group.

### The RRA And Its Background

During the 1970's, it became increasingly difficult for many types of businesses to obtain product liability insurance. During the period from 1975 to 1978, many companies recorded premium escalations of three hundred percent which were not attributable to their claims experience. Others were unable to obtain product liability coverage at any price.[1] The RRA evolved in 1981 as Congress's answer to this problem.

The RRA was not the first attempt to address this problem. The insurance industry attempted to respond voluntarily with Marketing Assistance Programs ("MAP's") in 1977. Unfortunately, MAP's assisted only those businesses that could not obtain product liability insurance at any price. They did not help businesses whose premiums had risen sharply, regardless of good claims records, or businesses for whom product liability insurance was unaffordable and therefore unavailable as a practical matter. *Id.* In addition to this unsuccessful initiative by the industry, a number of states tried to make product liability insurance more affordable by enacting laws designed to encourage the formation of various kinds of risk pooling entities. These efforts also proved ineffective in large part because such entities were subject to multiple sets of state regulations if they engaged in business on an interstate basis. *Id.* at 1434. As a result, Congress decided that federal intervention was justified. The

---

1. H.R.Rept. No. 97–190, 97th Cong., 1st Sess., reprinted in 1981 *U.S.Code Congressional &* *Adm.News* 1432, 1433.

House Report, *id.* at 1434–35, put the matter succinctly.

> Federal action is necessary because experience has shown that individual state legislation cannot facilitate the formation of self-insurance groups. Individual states can only enact legislation affecting their respective insurance law requirements. The practical effect of these laws is to prevent product sellers located in several states from forming such groups.... In product liability, because of the geographical dispersion of firms with similar risk interests, it is inevitable that more than one state jurisdiction becomes involved in insurance-oriented solutions. Therefore, federal action must be taken....

The federal legislation ultimately adopted offered a market solution to the problem. Through the RRA, Congress sought to encourage the creation of risk retention groups which would permit businesses to pool their product liability risks under either a self insurance or a group insurance approach. The presence of these alternatives in the marketplace was expected to provide businesses whose favorable claims experience had not been reflected in their premium rates with an opportunity to reduce their insurance costs and to encourage commercial insurers to establish rates more closely related to actual risk.

In order to facilitate the formation of risk retention groups, the RRA preempted state law to the extent necessary to provide federal authority for interstate operation and to eliminate duplicative state regulation. It did not, however, substitute a federal regulatory scheme. The RRA does not provide for federal incorporation or establish comprehensive standards governing the operations of risk retention groups. Rather, it contemplates that such groups will be chartered under the laws of one of the states and will have their formation and operation governed by the laws of that state. Once so chartered, a risk retention group is authorized by the RRA to operate in every state. No state may prohibit the formation or operation of a risk retention group in its jurisdiction and, with limited exceptions, no non-chartering state may regulate its activities there.

With this overview of history and approach of the Act as background, I now turn to the relevant statutory text. The first section of the RRA provides the following definition of "product liability:"

> "[P]roduct liability" means liability for damages because of any personal injury, death, emotional harm, consequential economic damage, or property damage (including damages resulting from the loss of use of property) arising out of the manufacture, design, importation, distribution, packaging, labeling, lease, or sale of a product, but does not include the liability of any person for those damages if the product involved was in the possession of such a person when the incident giving rise to the claim occurred.

15 U.S.C. § 3901(a)(3). For present purposes, two things are noteworthy about this definition. It includes any "liability for damages because of ... property damage ... arising out of the manufacture, design ... or sale of a product," without regard to the legal theory upon which the liability is predicated. Moreover, it expressly includes types of damage liability which would not be imposed in most states in tort actions. The House Committee Report thus "recognizes that the definition of 'product liability' may be broader than the existing product liability law of many jurisdictions in several respects" and offers the following explanation for the inclusion of damage liability not recoverable in some states in product liability litigation:

> The rationale for the inclusion of damages for loss of use of property and emotional harm to individuals is to allow product sellers to protect themselves through risk retention groups against these types of damages in jurisdiction where recoveries for such damages are permitted or where the applicable law may change in the future. The definition is permissive and concerns permissible coverage.

House Report, *supra* note 1, at 1438. In particular, the legislative history makes clear that liability for "consequential economic losses" was included in the definition of "product liability" even though "most courts do not allow recovery for . . . [them] in tort cases. . . ." *Id.* One such consequential economic loss that is normally unrecoverable is property damage to the product itself.[2]

After defining "product liability," the Act goes on to provide that this definition does not "affect either the tort law or the law governing the interpretation of insurance contracts of any State." 15 U.S.C. § 3901(b). In other words, while the Act defines product liability broadly so that all potential product liability risks can be insured, the Act does not change the tort or contract law of any state.

The RRA defines "risk retention group," in relevant part, as follows:

"[R]isk retention group" means any corporation or other limited liability association taxable as a corporation, or as an insurance company, formed under the laws of any State . . .

(A) whose primary activity consists of assuming and spreading all, or any portion, of the product liability or completed operations liability risk exposure of its group members;

(B) which is organized for the primary purpose of conducting the activity described under subparagraph (A);

(C) which is chartered or licensed as an insurance company and authorized to engage in the business of insurance under the laws of any State . . .

(D) which does not exclude any person from membership in the group solely to provide for members of such a group a competitive advantage over such a person; and

(E) which is composed of members each of whose principal activity consists of the manufacture, design, importation, distribution, packaging, labeling, lease, or sale of a product or products[.]

15 U.S.C. § 3901(a)(4)(A)–(E).

Partial exemption from state insurance law is afforded by Section 3902 of the Act:

Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—

(1) make unlawful or regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group . . .

(2) require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licensed in the State is required to belong;

(3) require any insurance policy issued to a risk retention group or any member of the group to be countersigned by an insurance agent or broker residing in that State; or

(4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.

§ 3902(a)(1)–(4).[3] The House Report, *supra* note 1 at 1441, stresses the importance of the preemption of state law.

This preemption is central to the Act's objective of facilitating the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state statutes that, in the aggregate, would thwart the interstate operation of product liability

---

**2.** For an excellent review of the case law in this area *see Pennsylvania Glass Sand Corp. v. Caterpiller Tractor Co.,* 652 F.2d 1165, 1170 and n. 17 (3d Cir.1981) (Adams, J.).

**3.** Several exceptions to the rule of exemption are omitted from this quotation. States, whether the chartering state or a non-chartering state, may, for example, levy premium taxes on risk retention groups, require them to submit financial reports, register agents for service of process, and to submit financial examinations. 15 U.S.C. § 3902(a)(1)(A)–(G).

risk retention groups.... Risk retention groups would not be subject to conflicting or duplicative regulations of other states in which it (sic) seeks to operate.

### The HOW Program

The Home Owner's Warranty Corporation administers the HOW program throughout the United States. That program has two major components—the Home Warranty and the Risk Retention Insurance policy. A home builder participating in the program issues to the initial purchaser of a home a two year "Home Warranty." For the first year following the sale, the builder warrants to the homeowner that the house will be free of defects due to non-compliance with the "Approved Standards" attached to the warranty. During the second year of occupancy, the warranty continues to cover defects in the plumbing, electrical, heating, and cooling systems due to non-compliance with the "Approved Standards." During this initial, two-year period, the builder also warrants that the house will be free from "Major Structural Defects," which are defined as follows:

A "Major Structural Defect" is actual physical damage to the following designated load-bearing portions of the home caused by failure of such load-bearing portions which affects their load-bearing functions to the extent that the home becomes unsafe, unsanitary or otherwise unlivable.

1. Foundation systems and footings;
2. Beams;
3. Girders;
4. Lintels;
5. Columns;
6. Walls and partitions;
7. Floor systems; and
8. Roof framing systems.[4]

In the event a defect occurs in an item covered by the warranty, the builder is committed to repair, replace or pay the reasonable cost of repairing or replacing the defective item. This warranty terminates at the end of the second year.

Under the HOW program, the builder purchases a "Risk Retention Insurance Policy" from HOW Insurance Company. In return for premium payments which vary depending on the length of time the builder has been in the Program and its claims record, the insurer agrees, in the language of the policy, to insure against loss resulting from: (1) Builder Default under the Home Warranty, and (2) "Major Structural Defects" of the home which first occur after expiration of the Home Warranty and before the termination of this Policy.[5] First, if a "Builder Default" occurs under the two-year Home Warranty, the insurer will either "repair, replace or pay to the Purchaser on behalf of the Builder the reasonable cost of such repair or replacement." *Id.* at Section IV(a). In addition, the policy protects the builder against liability for Major Structural Defects in the home that occur after two years but within ten years of the initial sale. If a Major Structural Defect occurs during this period, HOW Insurance will repair or replace the defect or will pay the homeowner the reasonable costs of the repair, whichever it chooses. The policy contains deductible and excess insurance clauses, and runs for ten years, regardless of any transfer of the ownership of the home. Claims under the policy are to be pursued by the homeowner with HOW Insurance, not the builder. Finally, if HOW Insurance incurs expense when a builder defaults on the Home Warranty, the insurer retains a right to be reimbursed by the builder.

### II. THE CONTROVERSY

HOW Insurance Company was licensed as an insurance company under the Delaware Insurance Code on July 27, 1981, and was authorized at that time to transact the busi-

---

4. Risk Retention Insurance Policy, section VIII(f), attached to Plaintiffs' Motion for a Temporary Restraining Order.

5. Risk Retention Insurance Policy, attached to Plaintiff's Motion for a Temporary Restraining Order, at section III.

ness of insurance in Delaware. The present controversy began on March 4, 1982 when the Commissioner notified HOW Insurance that HOW's "proposed insurance coverages and rates meet the statutory standards" for operation in Delaware, but expressed "reservations" as to whether the company was a risk retention group under the Act. The Commissioner indicated that he believed the Company was offering surety and property insurance under Delaware law, not product liability insurance. He concluded that "[u]ntil the questions raised are resolved, acceptance of this filing shall not be used by HOW Insurance Company as a basis for using the program in other States under the provisions of the Risk Retention Act."

After receiving legal memoranda, the Commissioner, by letter dated August 4, 1982, advised HOW Insurance that his review of the materials submitted had "not changed ... [his] tentative conclusions as to the applicability of the Product Liability Risk Retention Act to the coverage contained in your program." The Commission thereafter announced in a letter circulated to all members of the National Association of Insurance Commissioners that he had scheduled a public hearing for September 14, 1982 on the issue of whether the Company was offering product liability insurance and thus was a risk retention group. This hearing was postponed at plaintiffs' request and was never rescheduled by the Commissioner.

On March 19, 1983, the Commissioner issued an Order to Show Cause alleging that the HOW Insurance Company had violated Delaware law by purporting to operate as a risk retention group outside the State of Delaware. The Commissioner caused this Order to be dispatched to insurance commissioners around the country and several of these commissioners have since questioned the authority of HOW Insurance Company to do business in their jurisdictions. Based on this Order to Show Cause,

the State of Georgia's Insurance Commissioner issued a cease and desist Order on April 19, 1983, ordering HOW Insurance to suspend all further operations in that State. The Georgia Insurance Commissioner's Order was stayed, both temporarily and preliminarily, by the United States District Court for the Northern District of Georgia.

While it is not clear to me that the Commissioner has jurisdiction to determine whether HOW Insurance can do business in other jurisdictions, his actions have had an impact on plaintiffs sufficient to create a justifiable controversy between the parties which is ripe for resolution.[6]

### III. DISCUSSION

The Commissioner maintains that HOW Insurance is not a risk retention group for three reasons. First, he argues that state law, not the RRA, controls the issue of whether HOW Insurance issues product liability insurance and that under Delaware law, it does not. Second, the Commissioner contends that even if federal law controls, HOW does not issue product liability insurance because a new house is not a product. Finally, he argues that, even if a new house be deemed a product, the insurance issued by HOW nevertheless fails to fit within the RRA's definition of product liability insurance.

#### A. What Law Governs?

The Commissioner concedes that it is "clear and unambiguous" that the RRA's definition of products liability preempts state law that would regulate or prevent the formation of risk retention groups for purposes of interstate operation.[7] He argues nonetheless that one must look to the law of the state in which an insurer is chartered in order to determine the meaning of product liability for the purpose of identifying a risk retention group. In light of the plain language of the statute, this position is untenable.

---

6. Despite the fact that I refused to restrain further proceedings on the Commissioner's Order to Show Cause, there have been no such proceedings and he has not asked the Court to await further proceedings.

7. Defendants' Brief at 5.

Section 3901(a)(4) defines a risk retention group in part as a group that spreads the risks of product liability, as product liability is defined by Section 3901(a)(3). That section provides a definition of product liability which makes no reference to state law. This federal definition necessarily preempts any state definition. If this were not so, a state could prevent the formation of a risk retention group that met the relevant federal criteria. This would thwart the intent of Congress.

## B. *Is A New Home A Product?*

Under the Act, the primary activity of a risk retention group must consist of "assuming and spreading all, or any portion, of the product liability or completed operations risk exposure of its group members." 15 U.S.C. § 3901(a)(4)(A). As noted earlier, the definition of products liability under the RRA includes any liability for damages resulting from "property damage . . . arising out of the manufacture, design, . . . lease, or sale of a product." 15 U.S.C. § 3901(a)(3). The RRA defines completed operations liability to include "liability arising out of the installation of any product" if the installation has been completed and if the work took place on premises not owned or controlled by the installer. 15 U.S.C. § 3901(a)(1).

Congress used words in these key provisions of the RRA which are broad enough in meaning to include groups which spread the risks of liability faced by new home builders. Webster[8] defines product as "something produced by physical labor or intellectual effort," and defines produce as to "make often from raw material." Moreover, Congress's use of the word manufacture does not limit in any way the breadth of the concept of a product. Webster defines manufacture as the process or operation of making wares or other material products by hand or machinery.[9]

The Commissioner suggests that the literal meaning of these words should be narrowed because in common parlance they are more frequently associated with items of personal property rather than with things which, upon completion of the production process, become real property. The legislative history suggests that no such distinction between chattels and realty was intended, however. The Senate Report speaks directly to point:

> The definitions of product liability and risk retention groups are intended to include home builders and sellers within the terms of the bill. Under section 2(a)(4) of the bill, risk retention group's primary activity consists "of assuming all, or any portion, of product liability or completed risk exposure of its group members." Under section 2(a)(3), product liability includes claims "arising out of the manufacture, design * * *, distribution * * *, or sale of a product." Some State courts have treated builders and vendors of homes as product sellers for the purposes of express and implied warranty and strict liability tort law. See *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965). Therefore it is our intention to permit home builders to establish a risk retention group under this act to insure against any potential product liability.[10]

The Commissioner correctly points out that the Senate Report had not been published at the time the House enacted the RRA[11] and that it, accordingly, provided no basis for an inference as to the intent to those House Members favoring its passage.[12] The text of the bill adopted by the

8. Webster's Third New International Dictionary 1810 (1971).

9. *Id.* at 1378.

10. S.Rep. No. 172, 97th Cong., 1st Sess. 8 (1981).

11. The Senate Report was published on July 30, 1981, two days after the House passed the Act on July 28, 1981. 1981 U.S.Code Cong. & Adm.News 1432.

12. The Commissioner cites a number of cases for the proposition that congressional reports published after action by one house are entitled to no weight as legislative history. I need express no view on this proposition here, however, because I would reach the same ultimate

House, however, also provides some indication that the Commissioner's restrictive reading is not the appropriate one. The express inclusion in the scope of the Act of the liability of one who "installs" a product on the premises of another indicates that Congress intended to make no distinction between the manufacture of chattels and the manufacture of improvements to real estate.

■ More important, however, is the legal context in which Congress passed the Act. As the quoted portion of the Senate Report notes, the liability insurance needs of the building industry were virtually the same as those of chattel manufacturers and there is no reasonable basis for concluding that Congress, once having decided to act in this area, would wish to include the latter and exclude the former. While the common law originally treated these two categories of risk creators differently, by the time Congress enacted the RRA most jurisdictions had eradicated the distinction.[13] In recent years, courts have recognized that new homebuilders modify and assemble raw materials and components in a process comparable to that of chattel manufacturers and create similar risks to others in doing so. As a result, they have imposed liability upon new homebuilders which is virtually identical to that imposed upon manufacturers of chattels. In particular, as the Senate Committee was aware, most jurisdictions that had considered the issue by 1981 had held that a new home was a product for purposes of the principle of strict liability expressed in Section 402(a) of the Restatement of Torts, Section.[14] There is thus nothing in the nature of the liabilities or the needs of the homebuilding industry which might have motivated Congress to draw a line which would exclude it from the scope of the RRA. I similarly decline to draw such a line and conclude that liabilities arising from the manufacture, design, lease or sale of a new home may be "product liabilities" under the RRA.

### C. Does HOW Issue Products Liability Insurance?

As earlier noted, HOW's Risk Retention Insurance Policy has two distinct coverages: "Builder Default under the Home Warranty" coverage and "Major Structural Defect" coverage. They present materially different issues in the context of the RRA and I will discuss each in turn.

#### 1. Coverage For "Major Structural Defects".

The effect of HOW's Risk Retention Insurance Policy is to pool a portion of the product liability risk of HOW builder members which arises in the third through the tenth year of the occupancy of any home. In return for the payment of premiums by each builder, HOW Insurance promises it that HOW will repair, replace or pay for the repair and replacement of property damage, caused by major structural defects, for which the builder is liable. Having earlier concluded that the RRA definition of product liability is broad enough to include liability for damage to the product itself,[15] I have no difficulty finding that HOW's "Major Structural Defect" coverage assumes and spreads "all, or any portion, of the product liability . . . risk exposure of its group members."

The Commissioner's principal argument for a contrary conclusion with respect to this coverage is that it is in reality property loss coverage for the homeowner. If it were factually true that this portion of the HOW Program were in substance a sale of property loss coverage to homeowners, his position would have to be sustained. The

conclusion with or without considering the Senate Report.

13. See, e.g. Prosser, Torts, § 104, pp. 680–82 (1971), and cases cited therein.

14. See, e.g., Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965), cited in Senate Report, supra, at 8; Kriegler v. Eichler Homes, Inc., 269 Cal.2d 224, 74 Cal.Rptr. 749 (1969); Gay v. Cornwall, 6 Wash.App. 595, 494 P.2d 1371 (1972). Contra, Immergluck v. Ridgeview House, Inc., 53 Ill.App.3d 472, 11 Ill.Dec. 252, 368 N.E.2d 803 (1977).

15. See supra at 5.

legislative history of the RRA indicates that one of the major underlying premises of the Act was that risk retention groups would be providing insurance only to its own members and not to members of the public. This premise led Congress to conclude that it was safe to deprive non-chartering states of virtually all authority to supervise risk retention groups. As the House Report notes:

> Under the bill, the responsibility for regulatory supervision of a risk retention group rests with the commissioner of the chartering jurisdiction. Because risk retention groups will be providing insurance coverage only to their own members, and not to the public at large, it is believed that regulation by the chartering jurisdiction will be sufficient to provide adequate supervision of these groups
> . . . .

*supra* note 1 at 1444.

 The record does not support the Commissioner's argument, however. It is true, as he stresses, that a purchaser from a HOW-affiliated builder derives benefit from the policy, that such a purchaser receives a "Certificate" evidencing the fact that his home is covered by the program, and that claims are processed directly by HOW rather than through the builder. These facts do not suggest, however, that the "Major Structural Defect" coverage is anything other than product liability coverage. All liability insurance benefits third parties and claims under the typical automobile liability policy are processed directly by the insurer. Moreover, the Certificate, issued to homeowners as an informational tool, does not alter the character of the insurance issued by HOW. The policy itself is issued only to a participating builder in return for the payment of premiums based, in part, on that builder's claim experience. Homeowners themselves cannot buy HOW's insurance. If a purchaser selects a home

constructed by a participating builder, he or she automatically receives the benefit of the HOW "Major Structural Defect" coverage. Accordingly, I conclude that this coverage is not a subterfuge for selling property loss insurance to homeowners.[16]

### 2. Coverage For "Builder Default Under the Home Warranty."

The Commissioner views HOW's coverage for "Builder Default Under the Home Warranty" not as liability insurance, but as surety insurance. While this coverage does have features which resemble a suretyship arrangement, I need not decide whether the Commissioner's characterization is an appropriate one. For present purposes, it will suffice to hold that this aspect of the HOW program does not assume and spread all, or any portion of, the product liability risk exposure of the members of HOW Insurance.

Under the HOW policy, if a participating member defaults on its Home Warranty, HOW Insurance performs in the builder's stead. When it does this, HOW Insurance is entitled to recover any resulting expenses from the defaulting builder. Section X–B of the policy provides that the "Insurer shall have the right to obtain reimbursement from the Builder . . . where a claim arises out of a Builder's Default." *Supra* note 4 at section X–B. Section XIII–F restates this proposition in terms of subrogation.

> F. In the event of Default of the Builder to fulfill its obligations under the Home Warranty during the Term of the Home Warranty, then the Insurer shall have complete and full permission and authority to subrogate against the Builder to recover its costs in fulfilling and carrying out its obligations under this Policy.

*Id.* at section XIII–F.

 Thus, under the provisions of this "coverage," HOW Insurance performs a

---

16. The Commissioner also argues that provisions of the policy providing for a $250 deductible and making its coverage "excess insurance coverage" are inconsistent with a conclusion that HOW Insurance is a risk retention group offering product liability coverage. The RRA, however, requires only that a risk retention group spread "all, or *any portion*" of the product liability risk of group members. It is silent on the inclusion of deductible and excess clauses.

builder's obligations under the warranty if the builder does not and has a right to be paid for doing so. Accordingly, it does not assume and spread any potential liability of the builder. It follows that this "coverage" cannot be relied upon by HOW Insurance to demonstrate that it is a risk retention group under the RRA.[17]

■ Having so held, the issue arises as to whether HOW Insurance is nevertheless a firm "whose *primary* activity consists of assuming and spreading ... the product liability ... risk exposure of its group members." RRA, *supra,* at § 3901(a)(4)(A) (emphasis supplied). This issue has not been addressed by the parties, however, and I decline to resolve it at this time. While it is clear from the quoted language that Congress contemplated that risk retention groups would engage in some activities other than the issuance of product liability and completed operations liability insurance, it is not clear that it intended risk retention group to engage in other *insurance issuing* activities.[18] Moreover, one cannot determine on the basis of the current record which kind of coverage, Builders Default or Major Structural Defect, is HOW's "primary" activity.

### IV. CONCLUSION

For the foregoing reasons, both motions for summary judgment will be denied.

---

**17.** HOW has not provided a copy of the "Approved Standards" and it is not possible to determine the scope of the Home Warranty. For this reason as well as because the issue was not briefed, I express no opinion as to whether contractual liability which goes beyond that which would otherwise be imposed by negligence, implied warranty, or strict liability law can be product liability within the meaning of the RRA. Arguably, at least such liability arises out of a contract rather than the "manufacture" or "sale" of the product.

**18.** *See* House Report, *supra* note 1, at 1438, 1441, 1445.