**HOME WARRANTY CORPORATION, a mutual company, Home Owners Warranty Corporation, a Delaware corporation, and HOW Insurance Company, Plaintiffs,**

v.

**David H. ELLIOTT, Insurance Commissioner of the State of Delaware, Defendant.**

**Civ. A. No. 83–230–WKS.**

United States District Court,
D. Delaware.

April 27, 1984.

Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., Hamilton H. Boykin, Peter C. Schaumber, Colton & Boykin, Washington, D.C., for plaintiffs.

Catherine S. Mulholland, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant.

## OPINION

STAPLETON, Chief Judge:

On April 25, 1983, plaintiffs Home Warranty Corporation, Home Owners Warranty Corporation, and How Insurance Company (collectively, HOW) brough this action against defendant David Elliott, Insurance Commissioner of the State of Delaware (the Commissioner), seeking declaratory and injunctive relief. HOW sought a temporary restraining order and preliminary injunction against the Commissioner's refusal to allow HOW to use its filing with his office as authority to operate its "Home Owners Warranty" insurance program (the HOW program) on an interstate basis as a risk retention group under the Products Liability Risk Retention Act of 1981, 15 U.S.C. §§ 3901–3904 (the RRA or the Act). Injunctive relief was denied. The parties then briefed and argued cross motions for summary judgment.

This Court issued an opinion, 572 F.Supp. 1059 (D.Del.1983), the factual findings of which are incorporated herein. The opinion explicated the details of the RRA, the HOW program, and the arguments of the parties.[1] Several conclusions were reached. First, the RRA adopted a federal definition of product liability to be applied by the states in determining whether an

---

1. A brief recapitulation of the workings of the HOW plan may be helpful at the outset. Home Owners Warranty Corporation is a mutual company owned by builders of new homes who participate in the Home Owners Warranty program (the HOW program). The HOW program is an insurance program that runs for ten years. It consists of two major components—the Home Warranty coverage and the Risk Retention Insurance Policy. A home builder participating in the HOW program issues a two year "Home Warranty" to the purchaser of a covered home. For the first year following the sale, the builder warrants that the house will be free of defects caused by non-compliance with the Approved Standards (the Standards) attached to the warranty. During the second year, the warranty continues to cover defects in the plumbing, electrical, heating, and cooling systems due to non-compliance with the Standards. During the two year warranty period, the builder also warrants that the home will be free from "Major Structural Defects," as the policy defines them. (The definition is set out in the Court's earlier opinion, 572 F.Supp. at 1063). In the event that a defect occurs in an item covered by the two year warranty, the builder must repair, replace, or pay the reasonable cost of repairing or replacing, the defective item.

The second component of the program is the Risk Retention Insurance Policy, which builders participating in the HOW program purchase from HOW Insurance Company. In return for premium payments which vary depending on the length of time the builder has been in the HOW Program and its claims experience, HOW Insurance agrees to insure against liability resulting from (1) a builder's default under the aforementioned two year home warranty, and (2) major structural defects in the home occurring in the third through tenth years of the policy. First, if a builder defaults on his obligations under the two year Home Warranty, How Insurance will either repair, replace, or pay the purchasers the reasonable cost of any covered repair or replacement on behalf of the builder. If HOW Insurance incurs expense in this way, it has the right to seek reimbursement from the builder. Second, the policy protects the builder against liability for major structural defects in the home that occur in the third through tenth year of the ten year policy period. If a major structural defect occurs during this period, HOW Insurance repairs or replaces the defect or pays the homeowner the reasonable cost of repair or replacement, whichever it chooses.

insurance cooperative is a risk retention group. *Id.* at 1065. Second, a new home builder is a manufacturer and a new home is a product. Accordingly, the liabilities arising from the manufacture, design, lease, or sale of a new home may be considered product liabilities under the Act. *Id.* at 1065–66. Third, the coverage for major structural defects the HOW Program provides in its third through tenth years is coverage which assumes and spreads all, or any portion, of the product liability risk exposure of HOW's builder members. *Id.* at 1066–67. Fourth, the coverage provided in the first two years of the HOW program against builder default under the Home Warranty does not constitute such an assumption and spreading of the product liability risk exposure of HOW's builder members, because HOW reserves the right to seek reimbursement from the builder for amounts paid or for the benefit of the home owner. *Id.* at 1067–68. The issue then became "whether HOW insurance is nevertheless a firm 'whose *primary* activity consists of assuming and spreading ... the product liability ... risk exposure of its group members.' " (emphasis supplied) *Id.* at 1068. Since the parties had not addressed the issue, I declined to resolve it. Both motions for summary judgment were denied. The parties have renewed their motions for summary judgment on the unresolved issue of primary activity.

Plaintiffs argue that HOW's "primary activity" consists of assuming or spreading the product liability risk exposure of its group members. They argue that the coverage for major structural defects in the third through tenth year of the HOW program is the primary activity of HOW, as the word "primary" is normally understood. HOW contends that the builder warranty coverage in the first two years of the HOW program and its reimbursement provisions are subsidiary activities, integral to and necessary for the functioning of the

program as a whole. HOW argues that the overall, primary thrust of the HOW program is to provide products liability coverage. Further, HOW argues that S. 1046, a bill entitled "Clarification of the Risk Retention Act,"[2] and its legislative history, shows beyond doubt that Congress intended in the RRA to permit risk retention groups "to engage in other insurance issuing and insurance-related activities as an integral part of the products liability insurance primarily provided..." Reply Br. at 9. For his part, the Commissioner contends that the Act provided a limited exemption to state insurance regulation for products liability coverage only. "[T]o be exempt from state insurance regulation, a risk retention group may not engage in non-products liability insurance-issuing activities." Def.Op.Br. at 3. While he concedes that a risk retention group can perform the necessary business operations of a liability company, "[t]he phrase 'primary activity' ... is not a sanction to engage in non-products liability or non-completed operations insurance coverage...." *Id.*

There appear to be no material facts in dispute. Uncontested evidence shows that HOW's principal risk exposure lies in years three through ten of the policy. Almost three quarters of HOW's risk exposure is in these years, with only 27% of the total in the first two years.[3] Although none of HOW's policies have run through a full ten year policy period, the policies from 1975 and 1976, with eight and seven years elapsed respectively, show that the great bulk of HOW's losses occur in the third through tenth years.[4] Based upon these facts and given the prior rulings of this Court, the Commissioner does not contest that HOW's primary activity consists of assuming and spreading the product liability risk exposure of its group members and, accordingly, that HOW is a risk retention group within the meaning of the RRA.

The record also shows that the two-year builder warranty coverage is integral to

---

**2.** 15 U.S.C. § 3901(b), Pub.L. 98–193 (Dec. 1, 1983).

**3.** Affidavit of Michael Childers, ¶ 5.

**4.** *Id.* at ¶ 6.

and necessary for HOW's program, which is designed overall to assume and spread the product liability risks of HOW's members. In order to make HOW's program economically feasible, HOW's builder members must adhere to some minimum standards in their home construction work. Without such standards, slipshod work on the part of builders could cause huge losses that the HOW program could not cover. To that end, HOW has promulgated the Standards, *supra*, note 1, that all of HOW's builder members must meet in their work. After reciting the policy provisions, the Standards cover numerous "topics," such as concrete, masonry, wood and plastic coverage, thermal and moisture protection, and glass. The "topics" include virtually all aspects of a new home. Under each "topic" the Standards list from one to several possible deficiencies, a governing performance standard, and a short statement of the scope of HOW's specific responsibility for any defect. Without the assurance the Standards provide of a certain level of product quality, the HOW program could not work; the risk assumed by HOW without Standards would be inestimable, and therefore uninsurable in any practical sense.

Under the two year builder warranty coverage, HOW guarantees the builders' performance under the warranty, and has the right to seek reimbursement for any expenses it incurs as a result. This reimbursement provision gives each builder a stake in adhering to the Standards that is also essential to the economic viability of the HOW program. The right to seek reimbursement allows HOW to force builders who breach their warranties to accept the consequences of any substandard workmanship. Since defaulting builders must pay HOW, they gain nothing by substituting poor quality building for building that meets the Standards, and HOW is assured of a level of quality that makes its program viable. The builders thus have an incentive to meet the Standards.

In sum, the uncontested facts show that the HOW program, an insurance program put together by a risk retention group for its builder members, has as its primary and basic thrust the assuming and spreading of all or some portion of the product liability risks of its members. While the two year builder warranty coverage may not, standing in isolation, be product liability coverage,[5] it is clearly part and parcel of a products liability insurance program which could not stand without it. The question then becomes whether the Act's legislative history shows that a risk retention group, without subjecting its program to state regulation, may provide coverage which is not product liability coverage in and of itself, but which is an integral and necessary part of an insurance program the primary thrust of which is to provide product liability coverage.[6]

While the text and the legislative history[7] of the Act do not deal with this precise question, they do provide an answer. First, the Act and the House Report which explains it indicate that Congress' primary objective was to encourage and facilitate efficient pooling of product liability risks so that producers would be able to insure those risks at reasonable costs.[8] Second, they reflect a determination that risk retention groups, the vehicle chosen by Congress for achieving more efficient pooling

---

**5.** 572 F.Supp. at 1067–68.

**6.** Both sides agree that if a risk retention group issues coverage which is not incidental to, and an integral part of, product liability or completed operations insurance, that coverage would be subject to regulation by the states.

**7.** The House Report on the Act can be found reprinted in 1981 *U.S.Code Cong. & Ad.News* 1432–50.

**8.** For example, the House Report, *supra* note 7 at 1432–33, says in relevant part:

The Act will reduce the problem of the rising cost of product liability insurance by permitting product manufacturers ... to self-insure through insurance cooperatives called "risk retention groups."

The bill should reduce insurance cost for some businesses, particularly small firms, which have had good claims experience, but have not benefitted from that experience under the current insurance rate-making system.

of product liability risks, could not be formed and accomplish their intended function unless their product liability programs were exempted from regulation by the states.[9] Finally, both the House Report and the statutory definition of a risk retention group reflect a Congressional realization that such groups could not function without engaging in some activity ancillary to the principal function of spreading the product liability risks of their members.[10]

Based upon the problem addressed by Congress in the RRA and the approach selected by it to resolve that problem, I conclude that when a risk retention group formulates a program for the purpose of spreading the product liability risks of its members, the inclusion of ancillary provisions necessary to the viability of the program does not render the program or any segment thereof subject to regulations by the states. The HOW program is aimed at the goal of making product liability insurance available by encouraging efficient risk pooling. Without the two year builder warranty coverage and HOW's right to reimbursement, HOW's pooling of risks would not be efficient enough to work. I am confident that if Congress were to address the matter directly[11] it would find that programs such as HOW's were the kind of program it had envisioned when passing the RRA, and it would conclude that HOW should be able to market its program without state regulation.

Accordingly, HOW's motion for summary judgment will be granted and the Commissioner's motion for summary judgment will be denied.

Submit form of Final Judgment.

---

**9.** *See, e.g.,* 15 U.S.C. § 3902(a)(1)–(4), which deals explicitly with risk retention groups' exemptions from state laws, rules, regulations, or orders.

**10.** The House Report, *supra,* note 8 at 1438–39, states that the Act

> requires the group's primary activity to consist of assuming and spreading product liability and completed operations liability coverage among its members and not the business of investing, reinvesting or trading in securities for purposes other than providing reasonable reserves to meet liability claims.

---

**11.** HOW presses the argument that the legislative history of S. 1046, *see* note 2, *supra* and accompanying text, establishes beyond peradventure that the Act allows activities ancillary to providing product liability coverage. They cite the remarks in S. 1046's legislative history by Senator Kasten and Representative Florio which support this proposition. They cannot, however, point to the bill itself for support; its text forecloses such an argument. Nowhere does the bill mention the issue raised here. Its legislative history, therefore, is only after-the-fact commentary on the Act.