**NATIONAL HOME INSURANCE COMPANY Plaintiff**

v.

**Todd E. KING and Cheryl L. King Defendants**

**No. CIV.A.2003–131.**

United States District Court, E.D. Kentucky. at Covington.

Nov. 3, 2003.

Peter J. Stavros, Frost Brown Todd, LLC, Louisville, KY, for Plaintiff.

Thomas W. Rumpke, Boggs & Colvin, Florence, KY, for Defendant.

## OPINION AND ORDER

BERTELSMAN, District Judge.

This matter is before the court on defendants' motion to dismiss plaintiff's petition to compel arbitration (Doc. # 6).

The court heard oral argument on Wednesday, October 22, 2003. Peter J. Stavros represented the petitioner, National Home Insurance Company. Thomas W. Rumpke represented the respondents, Todd and Cheryl King, who also were present. Official court reporter Joan Averdick recorded the proceedings.

Having heard the parties, the court now issues the following opinion and order.

## FACTUAL AND PROCEDURAL BACKGROUND

This is an action to compel arbitration in an underlying construction dispute concerning defects in a home.

Home Buyers Warranty Corporation ("HBW") created and administers the nationwide Home Buyers Warranty Program, a ten year insurance-backed new home warranty program providing warranty coverage against certain types of construction defects in homes offered for sale by home builders. The warranties in the HBW program are insured pursuant to the Federal Risk Retention Act, 15 U.S.C. § 3901, *et seq.* As such, the builders' contractual obligations under the warranty program are backed by a Risk Retention Group.[1]

Petitioner National Home Insurance Company ("NHIC") is the risk retention insurer selected by HBW to insure HBW Warranties issued in Kentucky. NHIC is a Colorado Risk Retention Group created pursuant to the Federal Risk Retention Act.[2]

1. A "risk retention group" is a corporation or other limited liability entity organized for the primary purpose of spreading the risks of liability exposure among its group members. *See* 15 U.S.C. § 3901(a)(4)(A)—(C) (1998).

2. NHIC has been described as follows:
   NHIC insures residential home builder-members in forty-eight (48) states and the District of Columbia. It issues "warranties" or policies to cover the liability risks of these builders, namely claims for losses resulting from structural and workmanship defects in the construction of new residential housing. Builder-members are the insured party under the warranties, while individual homeowners are the beneficiaries.

Dickerson Construction is a Kentucky residential home builder owned by J. Matthew Dickerson, a Kentucky resident. Dickerson Construction was accepted into the HBW program in 2001. It is not named as a party in this action, although it was sued by the Kings in the state court action discussed below.

Respondents, the Kings, purchased a home from Dickerson in October of 2001. Dickerson enrolled the Kings' home in the HBW Program. The written warranty provided that the property would be free of workmanship defects for one year, systems defects for two years, and structural defects for ten years. If a warranted defect is found to exist in the home, NHIC, as the "Warranty Insurer," will "repair, replace or pay the reasonable cost of repair of any covered Defect or Structural Defect. The design, method, and manner of such repair shall be within the sole discretion of the ... Warranty Insurer, if the Warranty Insurer pays for the repair."

The warranty agreement also contains an agreement to arbitrate, which provides, in relevant part:

> Any and all claims, disputes and controversies arising under or relating to this Agreement, including without limitation, any claim of breach of contract, negligent or intentional misrepresentation or nondisclosure in the inducement, execution or performance of any contract, and breach of any alleged duty of good faith and fair dealing, shall be submitted to arbitration by and pursuant to the rules of Construction Arbitration Services, Inc. (hereinafter 'CAS') in effect at the time of the request for arbitration .... The decision of the arbitrator shall be final and binding and may be entered as

a judgment in any State or Federal court of competent jurisdiction.

\* \* \* \* \* \*

The parties expressly agree that this arbitration provision involves and concerns interstate commerce and is governed by the provisions of the Federal Arbitration Act, (9 U.S.C. § 1, et seq.), now in effect and as the same may from time to time be amended, to the exclusion of any different or inconsistent state or local law, ordinance or judicial rule; and to the extent that any state or local law, ordinance or judicial rule shall be inconsistent with any provisions of the rules of the arbitral association under which the arbitration proceeding shall be conducted, the latter rules shall govern the conduct of the proceeding. If any provision of this arbitration agreement shall be determined to be unenforceable by the arbitrator or by the court, the remaining provisions shall be deemed to be severable therefrom and enforceable according to their terms.

The Kings apparently have experienced numerous problems, including a leaky basement, in their new home which Dickerson has failed to repair. On September 5, 2002, the Kings filed suit against Dickerson in Boone County, Kentucky Circuit Court. According to the Kings, they only filed suit after "months" of trying unsuccessfully to get Dickerson to fix the problems in their home.

On September 6, 2002, the Kings filed a claim with HBW, which forwarded a copy of the claim to NHIC for adjustment. This claim included a one-year workmanship claim and a structural defect claim based upon a "substantial" crack that had

*National Home Ins. Co. v. State Corp. Comm'n of Virginia,* 838 F.Supp. 1104, 1107 (E.D.Va. 1993).

occurred across the basement floor of the Kings' home. The Kings further alleged that Dickerson had promised repeatedly to make repairs but had not done so.

NHIC retained Slesser Engineering to investigate the claimed defects at the Kings' home. Slesser concluded that there were no structural defects in the home.[3] On October 30, 2002, NHIC denied the Kings' claim as to structural defects only, but not as to the workmanship complaint, which was being handled separately through HBW customer service.

Jeff Stuwe of HBW wrote to the Kings' counsel on September 26, 2002, stating that "[w]e only act if the builder is unable or unwilling to remedy a defect that is COVERED by its warranty.... Should the builder fail to resolve any WARRANTED defects within 60 days of the date of this letter, or if your client(s) and Dickerson Construction, Inc. are unable to resolve any dispute through conciliation, we suggest arbitration." (Def.Exh. C).

On November 12, 2002, Stuwe wrote to Dickerson stating that HBW had received a second complaint from the Kings and that Dickerson had not responded to previous correspondence concerning the matter. Stuwe also wrote that "[i]f you fail to respond to us in writing with your intentions within five (5) days of receipt of this letter, then we may advise the homebuyers to file a claim and the warranty insurer will take the place of the builder." (Def.Exh. D).

Dickerson responded to Stuwe by letter dated November 19, 2002, stating that he intended to make the necessary repairs. (Def.Exh. E). Dickerson did review the Kings' home on November 26, 2002, but he made no attempts to perform the repairs.

When Dickerson failed to complete any repairs by December 10, 2002, the Kings requested that HBW notify NHIC that Dickerson was refusing to fix the house and further requested that the warranty insurer accept the claim, adjust the claim, and pay for the necessary repairs under the warranty agreement.

NHIC responded to the Kings via letter dated December 20, 2002. NHIC told counsel for the Kings that an inspector would inspect the Kings' home. NHIC described the process for reviewing the claims as "[a]fter the inspector has viewed the defects and their report is completed, it will be forwarded to NHIC. Once it is reviewed, we will analyze the defects to determine coverage based on the Warranty's Construction Quality Standards and prepare a cash settlement offer for the items afforded coverage." (Def. G).

Notwithstanding this letter, NHIC thereafter wrote the Kings' counsel on December 31, 2002, stating that it was

in receipt of new information that indicates that the builder and his attorney have attempted reconciliation and arbitration prior to the date of Mr. Stuwe's letter of December 13, 2002. Please refer to the warranty, page 6, Arbitration, which states: "Any and all claims, disputes and controversies arising under or relating to this Agreement, including without limitation, any claim of breach of contract, negligent or intentional misrepresentation or nondisclosure in the inducement, execution or performance of any contract, and breach of any alleged duty of good faith and fair dealing, shall be submitted to arbitration by and pursuant to the rules of Construction Arbitration Services, Inc. (hereinafter

---

**3.** The Kings have accepted this determination for now because the structural coverage lasts for ten years.

"CAS") in effect at the time of the request for arbitration."

(Def.Exh. H).

The Kings' counsel responded to NHIC by letter dated December 31, 2002, stating that NHIC was acting in bad faith in refusing to pay the claim. Specifically, the letter stated: "[Y]our letter dated December 31, 2002 is just an attempt to renege on your company's agreement to adjust this claim. In Kentucky, we call that breach of contract. When you are an insurance carrier, it's called bad faith." (Def.Exh. I).

Dickerson contacted the Kings on January 8, 2003, to set up a time when he could have access to the Kings' home. According to the Kings, NHIC informed them that Dickerson could either arbitrate or choose to repair. NHIC also construed the Motion to Compel in the Boone Circuit Court case as an offer by Dickerson to arbitrate the matter. (Def.Exh. K). However, the Kings contend that Dickerson has exercised the option of repairing the property via his previous correspondence. On January 23, 2003, the Kings informed Dickerson that he could have access to the house whenever he was available.

The parties prepared an Agreed Order for Judge Bamberger's signature, which he signed on March 24, 2003. This order provided, in relevant part, that

the claims contained in Counts I, II, and III of the Complaint filed by the Plaintiffs were dismissed by the Court and instead would be referred to arbitration, if required under the terms of the Warranty Agreement attached to Plaintiff's Complaint as Exhibit B. The parties did not argue that arbitration was required at this stage of the dispute and the Court did not seek to address this issue. Instead, the issue before the Court was simply whether the parties were required to arbitrate if the claim was not

resolved according to the terms of the Warranty Agreement.

It was the intent of the Court's February 14, 2003 Order to dismiss the claims contained in Counts I, II, and III and order that those claims be handled in accordance with the terms of the Warranty Agreement. If arbitration is required at some stage of the dispute under the Warranty Agreement, then the arbitration provision of the Warranty Agreement shall control. If the dispute is not ready for arbitration under the terms of the Warranty Agreement, then the claims should proceed in accordance with the Warranty Agreement and any and all obligations of the parties thereunder.

(Def.Exh. M).

On March 21, 2003, NHIC requested that Dickerson complete an arbitration request to be submitted to NHIC within twenty-one days. On March 25, 2003, the Kings demanded that NHIC adjust the workmanship claim allegedly in accordance with its obligations under the warranty agreement.

Dickerson finally showed up at the Kings' home with subcontractors on April 8, 2003. However, he did not perform any repairs at that time.

The Kings argue that Dickerson has repeatedly told them he is going to fix the problems which are covered under the warranty, but he has failed to live up to these obligations and, on the other hand, he has failed to request arbitration. The workmanship claim has been pending since September 2002. According to the Kings, NHIC, as an insurer of the warranty, has an obligation to adjust the claim.

On April 3, 2003, the Kings filed a First Amended Complaint against Dickerson and NHIC in Boone Circuit Court. In their amended complaint, the Kings allege

that NHIC breached its contractual obligations in bad faith and engaged in deceptive trade practices. NHIC answered as an affirmative defense that the Kings were required to arbitrate the claims alleged against NHIC.

On June 23, 2003, NHIC filed a "Petition to Compel Arbitration" in this court with jurisdiction based on diversity.

### ANALYSIS

#### A. *Is The Warranty Agreement An "Insurance Contract" For Purposes Of KRS 417.050(2)?*

■ The heart of this dispute is the question of whether Kentucky Revised Statute 417.050 applies to the contracts between NHIC, Dickerson, and the Kings, so as to render the arbitration clause contained therein unenforceable. KRS 417.050 states, in pertinent part:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law for revocation of any contract. *This chapter does not apply to* : ...

(2) *Insurance contracts* ....

KRS 417.050 (Michie Supp.2002) (emphasis added). Therefore, the question becomes: is the warranty agreement an "insurance contract" for purposes of KRS 417.050?

In *Buck Run Baptist Church, Inc. v. Cumberland Surety Ins. Co., Inc.,* 983 S.W.2d 501 (Ky.1998), the Supreme Court of Kentucky considered the meaning of "insurance contract" under KRS 417.050. There, a performance bond surety sought to compel arbitration with a property owner after a dispute arose about the performance of a second subcontractor retained by the surety to complete the construction project after the first subcontractor was terminated. The property owner argued that the dispute was not subject to arbitration because the performance bond was an "insurance contract" rendering "any dispute arising thereunder exempt from arbitration pursuant to KRS 417.050." *Id.* at 502.

The Court concluded that the construction contract at issue was not an "insurance contract" as contemplated by KRS 417.050:

There is a significant difference between types of insurance contracts contemplated by KRS 417.050 as exempt from arbitration and the typical construction contract. *In the case of the ordinary insurance contract between a policyholder and an insurance company, it can readily be understood why the legislature exempted future disputes from being subjected to compulsory arbitration because such contracts are contracts of adhesion to which the insured parties have limited bargaining power.* However, a contractual relationship which involves a commercial construction project, such as we have here, involves a negotiated voluntary agreement between relatively sophisticated commercial entities and a surety company, each of which undertakes a significant financial obligation. ... *The surety bond involved in such a transaction is generally not a contract of adhesion and generally does not include provisions which create disparity between the parties.* There is a considerable difference between the domestic retail insurance policy sold to individuals and corporations and the typical surety bond which involves commercial building projects.

*Id.* at 504 (emphasis added).

The Court further noted that because the term "insurance contract" is not defined in KRS 417.050, it should be used in

its "common application." *Id.* To this end, the Court discussed the typical characteristics of insurance policies as distinguished from surety contracts:

> An insurance policy is a contract of indemnity whereby the insurer agrees to indemnify the insured for any loss resulting from a specific event. *The insurer undertakes the obligation based on an evaluation of the market's wide risks and losses. An insurer expects losses, and they are actuarially predicted.* The cost of such losses are spread through the market by means of a premium.
>
> In contrast, a surety bond is written based upon an evaluation of a particular contractor and the capacity to perform a given contract. Compensation for the issuance of a surety bond is based on a fact-specific evaluation of the risks involved in each individual case. No losses are expected. Sureties maintain close relationships with the contractors they bond and require the contractor to sign an indemnity contract in favor of the surety company. As such a surety's relationship to its principal is more like that of a creditor/debtor than that of the traditional insurer/insured.

*Id.* at 504–05 (emphasis added).

Other courts and commentators have also examined the distinctions between these two types of contracts. In *Bruner and O'Connor on Construction Law,* the authors note that suretyship "involves an extension of standby credit by which the surety guarantees the principal's performance of its contractual relationship." 4 *Bruner and O'Connor on Construction Law* § 12:9 "Suretyship Distinguished From Insurance" (2003). In contrast, insurance does not involve an extension of credit but is "underwritten and priced based on the basis of actuarial analysis of

the risk of fortuitous loss among the insurer's population of policy holders." *Id.*

These commentators also note that a suretyship relationship is based upon the bond form normally prepared by the obligee, which the surety is requested by the principal to execute. *Id.* In contrast, an insurance relationship involves terms and extent of coverage dictated by the insurer. *Id.* Thus, a surety bond is generally not an adhesion agreement. *Id.* n. 3.

In *North Dakota Ins. Guar. Ass'n v. Agway, Inc.,* 462 N.W.2d 142 (N.D.1990), the Supreme Court of North Dakota found that a written agreement was indeed a contract of insurance despite the defendant's protestations that it merely reflected a self-insurance program. The Court noted that the policy bore all the "indicia" of a contract of insurance:

> This policy lists Agway as the "insured," specifies payment of "premiums," and provides dates of coverage, policy limits, deductibles, loss payable, coverage, and exclusions. It also includes provisions governing subrogation, notice of loss, and proof of loss. These documents support the trial court's conclusion that this was insurance.

*Id.* at 145.

Other courts have noted that the defining feature of an insurance contract is the shifting of the risk of loss. *See South Dakota Div. of Ins. v. Norwest Corp.,* 581 N.W.2d 158, 161–64 (S.D.1998) (holding that "Title Option Plus" program was title insurance, and not warranty or self-insurance, because it shifted risk of loss due to title defects from borrowers and mortgage holders).

Here, the various documents that collectively form the warranty agreement upon which the Kings base their claims against NHIC bear all the indicia of an insurance contract. First, the Kings are express

third-party beneficiaries under the "Home Warranty Insurance Policy" between NHIC and Dickerson. (Pl. Exh. 5). In the first section, titled "Insuring Agreements," the policy states: "The duty of the Company [NHIC] to perform the Insured's obligations shall inure to the benefit of the Purchaser/Homebuyer of the Home as an express third-party beneficiary."[4] *See National Home Ins. Co. v. State Corp. Comm'n of Virginia*, 838 F.Supp. 1104, 1107 (E.D.Va.1993) ("Builder-members are the insured party under the warranties, while individual homeowners are the beneficiaries.").

The NHIC/Dickerson insurance policy expressly incorporates the Home Buyers Warranty Booklet, making that booklet part of the policy. (Pl. Exh. 5 at 2). The booklet contains provisions addressing subrogation, the payment of premiums, and excess insurance, all typical elements of an insurance contract. (*Id.* at 3–4).

Next, the Builder Proposal Agreement states that the insurance provided by NHIC to cover its and Dickerson's obligations under the Home Buyers' Warranty is "Reinsured by national and international reinsurance companies." (Pl. Exh. 1 at 1). It also states that NHIC "insures Builder's obligations under the One and Two Year warranties." (*Id.* at 2).

The purchase by NHIC of reinsurance to cover its risk under its policy with Dickerson and its warranty with homebuyers is a classic example of the risk-shifting that characterizes an insurance arrangement. That is, the risk that NHIC assumes by obligating itself to fulfill Dickerson's obligations to the Kings, either by hiring someone else to perform repairs or by simply paying a cash settlement to the Kings, is shifted, in whole or part, to a reinsurer.[5] *See* KRS 304.45–020(5) (defining "insurance" under statutes regulating risk retention groups as "primary insurance, excess insurance, reinsurance, surplus lines insurance, and *any other arrangement for shifting and distributing risks* which is determined to be insurance under the law of this state") (emphasis added).

The documents reflecting the direct contractual relationship between the Kings and NHIC also bear indicia of an insurance contract. The "Builder Application for Home Enrollment," through which the Kings applied for the warranty, contains the following warning:

> It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties include imprisonment, fines, *denial of insurance*, .... Any insurance company or

---

4. For this reason, the Kings would have a cause of action against NHIC under this contract alone, without reference to the warranty agreement itself. The Kings note in their reply brief that they were not provided with a copy of the NHIC/Dickerson policy until after NHIC filed its petition in this court, but that their claims should be construed as also arising directly under that contract too, which is clearly an insurance contract. (Reply at 5 n. 1).

5. For this reason, this agreement is distinguishable from the HOW warranty at issue in *Home Warranty Corp. v. Elliott*, 585 F.Supp.

443, 446 (D.Del.1984), upon which NHIC relies. There, the court opined, but did not hold, that the two-year builder warranty coverage was similar to a surety agreement because HOW alone bore the risk under that part of the HBW program. However, in that case, HOW had not obtained insurance from an entity such as NHIC so as to add the necessary element of risk-shifting. Moreover, the court concluded that the HOW program as a whole has "as its primary and basic thrust the assuming and spreading of all or some portion of the product liability risks of its members." *Id.*

agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder (Builder) or Claimant (Homebuyer) for the purpose of defrauding or attempting to defraud the policyholder (Builder) or Claimant (Homebuyer) with regard to a settlement or award payable from *insurance proceeds* shall be reported to the *insurance commissioner of your state.*

(Pl. Exh. 2 at 1). This clause alone characterizes the homebuyer as a "claimant" under an insurance policy.

Next, the Certificate of Warranty Coverage issued by NHIC to the Kings states: "Insured by: National Home Insurance Co. Inc. (A Risk Retention Group)." (Pl. Exh. 3 at 1). The certificate also states that the Home Buyers Warranty Limited Warranty Booklet is part of the contract. (*Id.*).

That booklet contains further elements indicative of an insurance relationship:

- "Your Builder's Limited Warranty will be *insured by the insurance company* stated on the Certificate of Warranty Coverage which you will receive after your home is enrolled with Home Buyers Warranty Corporation (HBW)." (*Id.* at 1) (emphasis added).
- "You must then forward to HBW at the above address a *onetime $250.00 claim deductible (check payable to the Warranty Insurer* . . . .) At that point, HBW will forward the check and your file to the Warranty Insurer, *and the Warranty Insurer will adjust the claim.*" (*Id.* at 3) (emphasis added).
- *"The obligation of the Warranty Insurer shall be excess to any valid and collectible property or casualty insurance available to you or to the Builder,* whether such insurance is primary or excess insurance." (*Id.* at 5) (emphasis added).

- *"THIS IS AN INSURED WARRANTY.* This Warranty may not be canceled by HBW or the Warranty Insurer. *In order for the Warranty Insurer to plan for the right amount of reinsurance and to insure these warranty coverages at a correct price,* the Warranty Insurer needs to observe the warranty time limits carefully, and so do you, in order to avoid a material breach and the loss of warranty coverage. (*Id.*) (emphasis added).

NHIC's primary argument in support of its position that the warranty agreement is a surety agreement rather than an insurance contract is that the agreement makes Dickerson the primary obligor to the homebuyer and that if NHIC has to step in and perform in his place, then NHIC has a right of indemnity against Dickerson. While the agreement does provide that right to NHIC, viewed in context of all the other provisions discussed above— including in particular the fact that NHIC has reinsured its risk— this feature alone does not remove the agreement from the realm of insurance.

Moreover, the agreement is clearly a contract of adhesion containing terms dictated solely by NHIC. As such, it is the type of contract described by the Supreme Court of Kentucky in *Buck Run, supra,* to which KRS 417.050(2) was intended to apply.

■ Finally, although the HBW Warranty Booklet contains a "disclaimer" stating that the warranty is "not an insurance policy," (Pl. Exh. 4 at 5), it is well-established that "whether a particular contract is one of insurance does not depend on what it is called, but what it does." 16 *Williston on Contracts* (4th ed.) § 49:2 (citation omitted). *See also South Dakota Div. of Ins. v. Norwest Corp.,* 581 N.W.2d

158, 162 (S.D.1998) ("Norwest indicates in various documents that TOP is not title insurance. However, if that were all that was required, anyone could avoid regulation by Division simply through documentary disclaimers.").

In sum, while the warranty agreement here does have some features which resemble a suretyship arrangement, and while NHIC has obviously made efforts to clothe these agreements in such a fashion, it is clear that these agreements nonetheless function as an "insurance contract." As such, the agreement should be within the scope of KRS 417.050(2).

### B. Does The Federal Arbitration Act Preempt Statutes Such *As KRS 417.050?*

The next issue in this case is whether KRS 417.050, which would otherwise invalidate the arbitration clause at issue here, is preempted by the Federal Arbitration Act ("FAA"). Viewed in a vacuum, it is beyond dispute that the FAA does indeed preempt such state anti-arbitration laws. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 112, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (discussing history of FAA and its preemptive effect); *Allied–Bruce Terminix Co., Inc. v. Dobson,* 513 U.S. 265, 282, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (FAA preempts Alabama anti-arbitration statute); *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (FAA preempts California anti-arbitration provision in state franchise law).

Application of the FAA does not end this analysis, however, for yet another federal statute is called into play in this matter.

### C. *Does the McCarran–Ferguson Act "Reverse Preempt" The FAA?*

The McCarran–Ferguson Act states, in pertinent part:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b). The purpose of this Act is to affirm "the supremacy of the States in the realm of insurance regulation." *United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).

To determine whether the McCarran–Ferguson Act saves KRS 417.050 from preemption by a federal statute, such as the FAA, the court must consider a three-part test: (1) whether the federal statute specifically relates to the business of insurance; (2) whether the state law at issue was enacted for the purpose of regulating the business of insurance; and (3) whether the application of the federal law invalidates, supersedes or impairs the state law. *Id.* at 501, 113 S.Ct. 2202.

With respect to the first prong of this test, it is clear that the FAA is not a statute that relates specifically to the business of insurance. *See Stephens v. American Int'l Ins. Co.,* 66 F.3d 41, 44 (2d Cir.1995) ("No one disputes the fact that the FAA does not specifically relate to insurance."). With respect to the third prong, it is also clear that the application of the FAA would invalidate the anti-arbitration provision of KRS 417.050. The final question, then, is whether KRS 417.050(2) was "enacted for the purpose of regulating the business of insurance."

In *Securities and Exchange Comm'n v. National Sec.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court construed the term "business of insurance" under the McCarran–Ferguson Act. The Court emphasized that it is the relationship between the insurer and the insured

that should be the focus in determining what constitutes the "business of insurance," stating:

> But whatever the exact scope of the statutory term, it is clear where the focus was— it was on the relationship between the insurance company and the policyholder. *Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws governing the "business of insurance."*

*Id.* at 460, 89 S.Ct. 564 (emphasis added).

Similarly, in *United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), the Supreme Court held that an Ohio priority statute was saved from preemption by the McCarran–Ferguson Act as a state statute enacted "for the purpose of regulating the business of insurance" because its purpose was to protect policyholders. *Id.* at 2212. The Court gave a broad reading to this phrase, stating that any law with the "end, intention, or aim of adjusting, managing, or controlling the business of insurance" is a law "enacted for the purpose of regulating the business of insurance" for purposes of the McCarran–Ferguson Act. *Id.*

Based on this authority, both federal and state courts have held that state statutes that invalidate arbitration clauses *specifically as to insurance contracts* are indeed "enacted for the purpose of regulating the business of insurance" and thus not preempted by the FAA by virtue of the McCarran–Ferguson Act. *See Standard Security Life Ins. Co. v. West,* 267 F.3d 821, 823–24 (8th Cir.2001) (holding that FAA was reverse-preempted under McCarran–Ferguson Act by provision of Missouri Arbitration Act prohibiting arbitration clauses in insurance contracts); *Stephens v. American Int'l Ins. Co.,* 66 F.3d 41, 45–46 (2d Cir.1995) (holding that anti-arbitration provision of Kentucky Liquidation Act was exempt from preemption

by FAA under McCarran–Ferguson Act); *Mutual Reinsurance Bureau v. Great Plains Mutual Ins. Co., Inc.,* 969 F.2d 931, 934–35 (10th Cir.) (holding that Kansas statute providing that written agreement to arbitrate is invalid if contained in contract of insurance was enacted for purpose of regulating business of insurance and thus McCarran–Ferguson Act precluded application of FAA), *cert. denied,* 506 U.S. 1001, 113 S.Ct. 604, 121 L.Ed.2d 540 (1992); *Friday v. Trinity Universal of Kansas,* 262 Kan. 347, 939 P.2d 869, 872–73 (1997) (holding that McCarran–Ferguson Act prevented FAA from preempting Kansas statute invalidating arbitration clauses in insurance contracts; homeowners could not be compelled to arbitrate dispute with insurer).

The statutes at issue in the Eight and Tenth Circuit cases cited above are nearly identical to KRS 417.050, i.e., they provide a general rule of enforceability as to arbitration agreements but specifically exclude insurance contracts from their scope. Moreover, the rationale employed in those cases applies equally here: the Kentucky legislature has enacted a statute that is directed specifically at the relationship between the insurer and insured with the aim of protecting policyholders from mandatory arbitration agreements reached in the context of an adhesion contract. *See Buck Run,* 983 S.W.2d at 504.

The only cases that appear to reach a contrary result involve either a *general* state anti-arbitration statute not dealing specifically with insurance, *see American Bankers Ins. Co. v. Crawford,* 757 So.2d 1125, 1131–33 (Ala.1999); involve such limited analysis as to be unpersuasive, *see Triton Lines, Inc. v. Steamship Mutual Underwriting Ass'n,* 707 F.Supp. 277, 279 (S.D.Tex.1989); or involve claims where the McCarran–Ferguson Act was not raised as a defense to the claim of FAA

preemption, *see In re Transport Assoc., Inc.*, 263 B.R. 531, 533–34 (Bankr.W.D.Ky. 2001).

■ Finally, as courts have noted, "if there is a doubt regarding whether Congress intended to preempt a particular state insurance law, there is a presumption against preemption." *Ophthalmic Mutual Ins. Co. v. Musser*, 143 F.3d 1062, 1067 (7th Cir.1998).

Therefore, based upon the above authorities, the McCarran–Ferguson Act does "reverse preempt" the FAA to save KRS 417.050(2) from federal preemption. Thus, the arbitration clause contained in these insurance agreements is unenforceable.[6]

### D. *Does The Liability Risk Retention Act Exempt NHIC From The Effect Of KRS 417.050(2)?*

■ The federal Liability Risk Retention Act ("LRRA") authorizes persons or businesses with similar or related liability exposure to form "purchasing groups" for the purpose of purchasing liability insurance on a group basis and "risk retention groups" for the purpose of self-insuring. 15 U.S.C. § 3901(a)(4) & (5) (1998). Originally enacted under a different name in 1981 to cover only product liability insurance, the LRRA was amended in 1986 to apply to all liability insurance. *See Insurance Co. of Pennsylvania v. Corcoran*, 850 F.2d 88, 90 (2d Cir.1988).

The LRRA and its predecessor statute were enacted to reduce the problem of the rising costs of insurance for manufacturers, and so "Congress specified that the Act would preempt certain state laws that prohibited or hindered the formation of these groups." *Mears Trans. Group v.*

State of Florida, 34 F.3d 1013, 1016 (11th Cir.1994), *cert. denied*, 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 852 (1995). The Act states, in part:

> [A] risk retention group *is exempt from any State law*, rule, regulation, or order *to the extent that such law*, rule, regulation, or order *would*—
>
> (1) *make unlawful, or regulate, directly or indirectly, the operation of a risk retention group* except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group and any State may require such a group to—
>
> (A) comply with the unfair claim settlement practices law of the State . . . .
>
> (2) *otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.*

15 U.S.C. § 3902(a) (emphasis added). Congress stated that only the laws of non-chartering states "which attempt to regulate, directly or indirectly, the *formation and operation* of approved risk retention groups ... are preempted." *Id.* at 1017 (citation omitted) (emphasis added).

When Congress expanded this Act in 1986 to cover all types of liability insurance, "it included provisions to preserve the states' traditional role in regulating insurance and protecting the public." *Id.* In doing so, Congress sought to "augment[ ] the authority of non-chartering States to regulate solvency, trade practices and other matters" and it "contemplated

---

**6.** For this reason, the court also finds unpersuasive NHIC's argument that the Kings "waived" application of KRS 417.050 by virtue of the provision in the warranty agreement stating that the FAA applies. That provision is but one aspect of the overall arbitration clause which, as already discussed, is rendered unenforceable by operation of law.

that States may enact statutes and issue regulations to protect the public to the extent such action is not exempt by th[e] Act." *Id.* (citations omitted).

Consistent with the protection afforded risk retention groups under this Act, the Kentucky statutes regulating risk retention groups exempt such groups from various requirements related to their formation and operation that would otherwise apply to insurance companies. *See generally* KRS 304.45–010 to 304.45–150.

NHIC argues that the LRRA exempts it from the effect of KRS 417.050. NHIC cites no authority on point to support this argument, however, and the purpose of the LRRA as discussed above would not appear to support such a conclusion. As noted, Congress enacted the LRRA to remove barriers to the "formation and operation" of risk retention groups, which otherwise might be illegal under state law. Kentucky, like other states, has complied with its obligations under the Act by expressly exempting risk retention groups such as NHIC from regulatory requirements otherwise imposed on insurance companies. Prohibiting the enforcement of an arbitration clause does not "make unlawful" the formation or operation of such a risk retention group.

Moreover, application of KRS 417.050(2) to NHIC does not offend the non-discrimination principle underlying the LRRA. To the contrary, requiring NHIC to abide by this statute puts it on equal footing with all other insurers in Kentucky who are prohibited from enforcing arbitration clauses in agreements with their insureds.

In sum, there appears to be nothing in the LRRA that would shield NHIC from the effect of KRS 417.050(2), which renders the arbitration clause in the warranty agreement unenforceable.

Therefore, having heard the parties, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that defendants' motion to dismiss plaintiff's petition to compel arbitration (Doc. # 6) be, and it is, hereby **GRANTED.** A separate judgment shall enter concurrently herewith.