**Hugh SCOTT, Appellant**

v.

**LOUISVILLE BEDDING COMPANY, Appellee.**

No. 2012–CA–000252–MR.

Court of Appeals of Kentucky.

July 12, 2013.

Todd C. Myers, Lexington, KY, for Appellant.

Eric L. Ison, Margaret E. Keane, Benjamin J. Lewis, Louisville, KY, for Appellee.

Before KELLER,[1] STUMBO, and THOMPSON, Judges.

## OPINION

KELLER, Judge:

Hugh Scott (Scott) appeals from the circuit court's orders denying his motion to compel arbitration. On appeal, Scott argues that an arbitration provision contained in an agreement entered into by Louisville Bedding Company (Bedding), United Re Trust, and United Re AG is enforceable and that he is entitled to enforce it. Bedding argues that the arbitration provision is not enforceable and, even if it is, Scott is not entitled to enforce it. Having reviewed the record and the arguments of the parties, we agree with the circuit court that Scott is not entitled to enforce the arbitration provision and affirm.

## FACTS

The parties had not conducted any significant discovery before Scott filed this appeal. Therefore, we take our recitation of the facts from the parties' pleadings.

Bedding provides health insurance to its employees, which it self-insures. In 2008, Bedding approached American Administrators for advice and guidance with regard to administering its health insurance plan and obtaining excess or "stop-loss" insurance. Based on advice from American Administrators, or based on its own investigation,[2] Bedding applied to participate in the United Re Trust, which is

---

1. Judge Michelle M. Keller authored this opinion prior to her appointment to the Kentucky Supreme Court. Release of this opinion was delayed by administrative handling.

2. Whether Bedding relied on advice from American Administrators is currently being litigated.

administered by United Re AG (hereinafter collectively the United Re Entities), and Bedding and the United Re Entities entered into a "Trust Agreement" (the Agreement).[3] The Agreement was signed by Scott, as President of United Re AG, and contains the following pertinent provision:

> THIS AGREEMENT AND THE TRUST IT CREATES SHALL BE INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF TEXAS. IN THE EVENT THERE IS A DISPUTE BETWEEN THE BENEFICIARY AND TRUSTEE AS TO ANY ASPECT OF THE TRUST, INCLUDING DISPUTES OVER DISTRIBUTION OF FUNDS, BENEFICIARY AND TRUSTEE HAVE AGREED TO BINDING ARBITRATION WITH THE AMERICAN ARBITRATION ASSOCIATION AS OUTLINED IN SCHEDULE B.

Schedule B to the Agreement, which is entitled "Participation Guide United Re Trust", contains the following pertinent provision:

> *LEGAL ACTION*—NO LEGAL ACTION CAN BE BROUGHT AGAINST THE TRUSTEE OR THE TRUST. ANY CONFLICTS OR DISPUTES RELATING TO THE CREATION OR ADMINISTRATION OF THE TRUST SHALL BE RESOLVED THROUGH BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION IN THE STATE IN WHICH THE EMPLOYER IS HEADQUARTERED.

Bedding believed that, pursuant to the Agreement, the United Re Entities would purchase stop-loss insurance to cover any medical expenses Bedding incurred in excess of $200,000 per individual employee or $1,878,341 in the aggregate. Scott argues that the United Re Entities were not offering any type of insurance and that they were not obligated to purchase stop-loss insurance coverage for Bedding. During the year the Agreement was in place, Bedding incurred medical expenses that exceeded the $1,878,341 provided for in the Agreement by $925,846.97. Pursuant to its understanding of the Agreement, Bedding submitted a claim to the United Re Entities seeking payment in that amount. Bedding's claim was denied, and Bedding filed a complaint against the United Re Entities, Scott, American Administrators, and a number of other individuals. In its complaint, Bedding alleged that: Scott exercised complete control over United Re Trust; the United Re Entities were simply Scott's "alter egos"; United Re Trust is an unincorporated organization; United Re Trust unlawfully sold insurance; United Re Trust was a "scheme" to avoid insurance regulations; the United Re Entities were the defendants in a number of lawsuits that threatened their financial stability; neither Scott nor any of the other defendants advised Bedding of the financial instability of the United Re Entities; and the actions of Scott and/or United Re Trust amounted to fraud, misrepresentation, negligent misrepresentation, deceit, breach of contract, and/or unjust enrichment. We note that United Re AG was not named as a party in the complaint that was filed of record on June 14, 2010. However, based on other documents in the record, it appears that Bedding filed an amended complaint and named United Re AG as a party defendant at some point early in the litigation.

The defendants, with the exception of the United Re Entities, filed answers. In

---

**3.** We note that the Agreement was not signed by Bedding or by anyone on behalf of Bedding. However, Bedding has not argued that it is not bound by the terms of the agreement.

his answer, Scott, in pertinent part, denied that he is the alter-ego for the United Re Entities and asserted that the court lacked jurisdiction because the Agreement was subject to arbitration.

Because the United Re Entities did not file an answer to Bedding's complaint and/or amended complaint, the court entered a default judgment against them. Neither the United Re Entities, nor anyone on their behalf, challenged that judgment, and it is now final.

On February 2, 2011, approximately eight months after Bedding filed its complaint, Scott filed a motion to dismiss or, in the alternative, to compel arbitration. We note that several of the other defendants had filed similar motions at or near that same time. However, because those defendants are not parties to this appeal, we do not further address their motions.

On June 7, 2011, the court entered an order compelling arbitration. In doing so, the court determined that the Agreement was valid and enforceable and that the arbitration provisions were also valid and enforceable.

Bedding filed a motion to alter, amend, or vacate, arguing that the arbitration provisions in the Agreement are not enforceable under the Kentucky Uniform Arbitration Act (KUAA) because the Agreement is an insurance contract, and it does not specify Kentucky as the site for any arbitration proceedings. Furthermore, Bedding argued that by responding to discovery requests and filing a motion to dismiss, Scott had waived any right to compel arbitration. Scott argued to the contrary.

On September 30, 2011, the court entered an amended opinion and order. In that order, the court held that it lacked jurisdiction under the KUAA to enforce the arbitration provisions because the Agreement did not specify that any arbitration would take place in Kentucky. However, the court noted that, as applied to this case, the Federal Arbitration Act (FAA) preempted the KUAA, thus giving the court jurisdiction. The court then determined that because Scott signed the Agreement in his capacity as "President" of United Re AG, he was not a party to the Agreement; therefore, he could not enforce the arbitration provisions. The court did not address whether Scott's conduct during litigation acted as a waiver of the arbitration provisions. Furthermore, the court stated that it did not need to determine whether the Agreement was an insurance contract and was not doing so.

Scott then filed a motion to alter, amend, or vacate and, in the alternative, renewed his motion to dismiss. On January 9, 2012, the court entered its final order addressing the arbitration issue. In that order, the court found that the Agreement is an insurance contract and thus unenforceable under the KUAA. Furthermore, the court found that the FAA did not preempt the KUAA's exemption of insurance contracts from arbitration. Finally, the court held that since the arbitration provisions were unenforceable, Scott could not use those provisions to compel arbitration. It is from the court's two orders denying his motions to compel arbitration that Scott now appeals.

On appeal, Scott argues that the arbitration provision of the Agreement is enforceable under both the FAA and KUAA; the provision inures to his benefit personally; he has not waived his right to enforce the provision because of his conduct during litigation in circuit court; the Agreement is not an insurance contract; if the Agreement is an insurance contract, it is enforceable because the KUAA exemption for insurance contracts is preempted by the FAA; and the Convention on the Recognition and Enforcement of Foreign Ar-

bitral Awards (the Convention) requires enforcement. Bedding argues to the contrary.

## STANDARD OF REVIEW

■ When reviewing a trial court's ruling on the enforceability of an arbitration agreement, "we defer to the trial court's factual findings, upsetting them only if clearly erroneous or if unsupported by substantial evidence, but we review without deference the trial court's identification and application of legal principles." *Conseco Finance Servicing Corp. v. Wilder,* 47 S.W.3d 335, 340 (Ky.App.2001).

## ANALYSIS

■ Before addressing the specific issues raised by Scott on appeal, we note the following general principles. "[A]rbitration is a matter of contract ... [and] courts must place arbitration agreements on an equal footing with other contracts ... enforc[ing] them according to their terms[.]" *AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011). As with any contract, parties to an arbitration agreement are free "to limit the issues subject to arbitration, ... to arbitrate according to specific rules, ... and to limit *with whom* [they] will arbitrate ... disputes[.]" *Id.* at 1748–49 (Emphasis in original and internal citations omitted). When there are any doubts as to the scope of an arbitration agreement, those doubts should be resolved in favor of arbitration. *Hill v. Hilliard,* 945 S.W.2d 948, 951 (Ky.App.1996).

■ With those general principles in mind, we first address whether Scott was a party to the Agreement or at least a beneficiary of its terms entitled to enforce the arbitration provisions. Bedding admits that it entered into an agreement to arbitrate any claims it has against the United Re Entities; however, it argues it did not enter into an agreement to arbitrate any claims it might have against Scott. Scott argues that even though he was not a signatory to the Agreement, he is entitled to enforce it in his capacity as an employee of United Re AG. We agree with Scott for two inter-related reasons.

First, in its complaint, Bedding alleges that Scott and United Re AG are one and the same. Additionally, Bedding alleges that: under the Agreement, Scott agreed to reimburse Bedding for covered claims and failed to do so; Scott and the United Re Entities are in the business of selling stop-loss insurance; it has "valid and enforceable contracts with United Re Trust and Hugh Scott"; Scott is personally liable under the Agreement; Scott signed the Agreement; and it suffered losses because Scott breached the Agreement. In short, Bedding treats Scott and the United Re Entities as if they are one and the same. Bedding cannot, on the one hand seek the benefit of the Agreement and, on the other hand, disavow the arbitration provisions that are part of the Agreement. *See North Fork Collieries, LLC v. Hall,* 322 S.W.3d 98 (Ky.2010).

Second, although we are not bound by it, we are persuaded by the federal district court's opinion in *Kruse v. AFLAC Int'l, Inc.* 458 F.Supp.2d 375, 382–83 (E.D.Ky. 2006). In that case, Kruse filed a complaint in federal district court asserting a number of state and federal claims against AFLAC, three entities related to AFLAC, and an individual who was an employee of one of the entities. The defendants moved to dismiss the district court case based on an arbitration agreement between Kruse and AFLAC and one of the other entities. Kruse argued that she could not be forced to arbitrate because the other two entities and the individual were not signatories to the arbitration agreement. In holding that the arbitration agreement was en-

forceable against all of the entity defendants, the court found that the related entities stood "in the shoes of the entity that signed the agreement" and could, therefore, enforce it.

As to the individual, the court held that because his actions arose out of his capacity as an employee or agent of AFLAC, the individual was entitled to enforce the arbitration agreement. As the U.S. district court did in *Kruse*, we are persuaded by the reasoning in the Opinion of the United States Sixth Circuit Court of Appeals in *Arnold v. Arnold Corp.-Printed Communications for Business*, 920 F.2d 1269 (6th Cir.1990). In *Arnold*, the Court noted that a number of federal circuits have held that non-signatory employees whose alleged actions arose out of their employment are covered by their employers' arbitration agreements. In referring the dispute before it to arbitration, the *Arnold* Court noted that the agreement in question indicated "that the parties' basic intent was to provide a single arbitral forum to resolve all disputes...." *Id.* at 1282. Based on the intent of the parties and the fact that the claims arose out of employment, the Court referred the matter to arbitration.

As in *Arnold*, the clear intent of the language in the arbitration provisions is to provide a single arbitral forum to resolve all disputes. Furthermore, as outlined above, Bedding's allegations of wrongdoing against Scott are all related to his actions as an employee, alter-ego, mastermind, and/or agent of United Re AG. Because the intent of the arbitration provisions is clear and the alleged wrongful activity by Scott took place during and in the course of his employment, Scott is entitled to enforce the arbitration provisions in the Agreement.

Having determined that Scott can enforce the arbitration provisions, we must next determine if the provisions are enforceable. To do so, we must first determine if the Agreement is an insurance contract. If it is, then the arbitration provisions may be exempt from enforcement pursuant to the KUAA. If the provisions are exempt, we must determine whether the KUAA's exemption is preempted by the FAA. Finally, we must determine whether the arbitration provisions must be enforced pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention). We address each issue separately below.

### 1. Is the Agreement an Insurance Contract?

■ The circuit court found that the Agreement is an insurance contract and thus unenforceable under the KUAA and the FAA. Bedding argues that the court is correct. Scott argues that it is not.

"'Insurance' is a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils called 'risks,' or to pay or grant a specified amount or determinable benefit or annuity in connection with ascertainable risk contingencies, or to act as surety." Kentucky Revised Statute (KRS) 304.1-030. Bedding argues that, pursuant to the Agreement, United Re Trust agreed to pay or indemnify it for medical expenses in excess of $200,000 per individual employee and $1,878,341 in the aggregate. Therefore, under the plain meaning of the statute, the Agreement created a contract of insurance.

Scott argues that the Agreement does not create a contract of insurance because the Agreement only mentions insurance once, when it states that United Re Trust will purchase insurance for the benefit of the Trust. Furthermore, Scott notes that the Agreement provided "lines of credit to

beneficiaries," which is a feature generally not found in insurance contracts.

To determine whether the Agreement is an insurance contract, we look to the language of the Agreement. The Agreement consists of three parts: the "Trust Agreement" and two "schedules." The "Trust Agreement" provides that the Trust will obtain insurance coverage for the benefit of the Trust and for the payment of expenses and the distribution of Trust income and principal. Schedule A sets forth the monthly contributions Bedding was required to make, the maximum monthly claim cost per employee, and the "Minimum Deductible" and "Aggregate Deductible."

Schedule B, the Participation Guide, provides that each beneficiary will have a separate trust account from which claims will be paid. However, assets of all of the beneficiaries may be pooled "to maximize earnings and investment opportunities." If a beneficiary's claims exceed its trust account, then "the Trustee shall allocate actual or anticipated earnings of the net trust estate to further fund paid claims." If paid claims exceed the net trust estate, then a line of credit will be opened unless the beneficiary has waived this option. An endorsement to Schedule B, the Overlay Provision, provides that the Trust will purchase insurance for the benefit of the Trust. If a beneficiary elects this option, which Bedding did, the beneficiary is not entitled to excess funds or to the credit provision in the Participation Guide.

In short, it appears that the Trust was designed to accept contributions from self-insured employers, pool and invest those contributions, pay claims from each employer's contributions, and, to the extent claims exceeded an employer's contributions, pay the excess from pooled assets and any income generated by those assets. In the alternative, a beneficiary could choose to have the Trust purchase insurance to cover excess claims. Such a beneficiary would then not have access to excess Trust funds.

Having reviewed the Agreement, we agree with the circuit court that it is an insurance contract. Bedding participated in the Trust in order to obtain indemnity for the risks of being self-insured. Pursuant to the Agreement, the Trust agreed to do so. Scott's argument that the Agreement is not an insurance contract because the only insurance mentioned is for the benefit of the Trust is not persuasive. The fact is that the Trust was obligated to pay the excess claims or to indemnify Bedding for the excess risk. Whether the money to make such payments came from excess Trust funds or from an insurance policy that benefited the Trust is irrelevant. It is the obligation to indemnify another for risk that is the hallmark of insurance, and that obligation was the Trust's. Therefore, we discern no error in the circuit court's finding that the Agreement is an insurance contract.

### 2.  Is the Agreement Exempt from the KUAA?

KRS 417.050(2) provides that the KUAA does not apply to insurance contracts, unless such contracts are "between two (2) or more insurers[.]" Scott argues, for the first time in his reply brief, that KRS 417.050(2) does not apply because Bedding, as a self-insured entity, is an "insurer." Because Scott did not raise this argument before the circuit court, we need not address it. *See Kaplon v. Chase*, 690 S.W.2d 761, 763 (Ky.App.1985). However, for the sake of completeness, we briefly do so.

As noted above, we are not bound to follow the holdings of the U.S. 6th Circuit Court of Appeals. However, we once again find guidance therein. In *Associated Industries of Kentucky, Inc. v. U.S.*

*Liability Ins. Group*, 531 F.3d 462, 465 (6th Cir.2008), the Court was called upon to determine if a group self-insured fund is "insurance." In reaching the conclusion that it is, the Court addressed whether an individual self-insured entity is "insurance" as follows:

> Kentucky law defines insurance, in relevant part, as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils called 'risks.'" Ky.Rev.Stat. § 304.1–030. Individual self-insurance means that an entity bears all of its own risks and purchases no insurance at all. Therefore, individual self-insurance is not "insurance" within the meaning of Kentucky law because it does not involve "a contract whereby one undertakes to pay or indemnify *another* as to loss from ... 'risks.'" *Id.* (emphasis added).

The Court then cited to other state court opinions that reached the same result, *i.e.:*

> individual self-insurance is not insurance because it does not involve the shifting of risk to another. *See, e.g., Bowens v. Gen. Motors Corp.*, 608 So.2d 999, 1003 (La.1992) ("This court has held that 'self-insurance is, in actuality, not insurance at all'"); *Am. Nurses Ass'n v. Passaic Gen. Hosp.*, 192 N.J.Super. 486, 471 A.2d 66, 69 (1984) ("so-called self-insurance is not insurance at all").

The preceding, although not binding, is persuasive, and we agree with the Sixth Circuit that individual self-insurance, such as what Bedding had, is not insurance. Therefore, the exemption from arbitration in KRS 417.050(2) applies to the Agreement.

### 3. Is the KUAA's Exemption for Insurance Contracts Preempted by the FAA?

It is undisputed that the FAA preempts the KUAA. Because the FAA does not exempt insurance contracts from arbitration, absent any other federal law to the contrary, the FAA would render the KUAA's exemption null and void. However, as noted by the parties, the McCarran–Ferguson Act (15 U.S.C. § 1012(a)(b)) provides that

> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.... [and] No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance....

Thus, the McCarran–Ferguson Act negates, or "reverse preempts," the FAA's apparent preemption of state regulation of the business of insurance.

■ Scott argues that the McCarran–Ferguson Act does not apply because KRS 417.050 is not a law "enacted ... for the purpose of regulating the business of insurance." According to Scott, the business of insurance that a state can regulate free from the FAA's preemption entails the "underwriting and spreading of the *policyholder's risk*." (Emphasis in original). Scott argues that KRS 417.050 regulates the manner in which disputed claims are resolved, not underwriting or the spreading of the risk; therefore, KRS 417.050 does not regulate "the business of insurance" and is not exempt from the FAA's preemption by the McCarran–Ferguson Act.

In support of this argument, Scott relies primarily on two cases, *In re Transport Associates, Inc.*, 263 B.R. 531 (Bankr. W.D.Ky.2001) and *Triton Lines, Inc. v.*

*Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.,* 707 F.Supp. 277 (S.D.Tex. 1989).

*In re Transport Associates* is distinguishable for three reasons: (1) it involves the interaction of the KUAA, the FAA, and federal bankruptcy law; (2) it does not appear that any of the parties raised any issues regarding the application of the McCarran–Ferguson Act; and (3) in *National Home Ins. Co. v. King,* 291 F.Supp.2d 518, 530 (E.D.Ky.2003), the Federal District Court for the Eastern District of Kentucky held that "the McCarran–Ferguson Act does 'reverse preempt' the FAA to save KRS 417.050(2) from federal preemption." *Triton Lines* is distinguishable for two reasons: (1) the dispute arose from a maritime contract containing an arbitration clause; and (2) as noted below, the analysis in *Triton Lines* is so superficial as to be unpersuasive.

■ As noted above, we are not bound to follow the holdings of the federal district court; however, we believe that the court's reasoning in *King* is persuasive and adopt it as our own herein. Initially, we note that, based on the McCarran–Ferguson Act, "if there is a doubt regarding whether Congress intended to preempt a particular state insurance law, there is a presumption against preemption." *King,* 291 F.Supp.2d at 530 (Citation omitted). Furthermore:

> To determine whether the McCarran–Ferguson Act saves KRS 417.050 from preemption by a federal statute, such as the FAA, the court must consider a three-part test: (1) whether the federal statute specifically relates to the business of insurance; (2) whether the state law at issue was enacted for the purpose of regulating the business of insurance; and (3) whether the application of the

federal law invalidates, supersedes or impairs the state law.

*Id.* at 528.

Applying that three-part test herein, it is clear that the FAA is not specifically related to the business of insurance and that the FAA, if applied, "would invalidate the anti-arbitration provision of KRS 417.050." *Id.* Having satisfied the first and last prongs of the test set forth in *King,* we must address the second and more difficult prong-whether KRS 417.050 was enacted to regulate the business of insurance. To resolve this issue, we again look to the court's opinion in *King.*

In *Securities and Exchange Comm'n v. National Sec.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court construed the term "business of insurance" under the McCarran–Ferguson Act. The Court emphasized that it is the relationship between the insurer and the insured that should be the focus in determining what constitutes the "business of insurance," stating:

> But whatever the exact scope of the statutory term, it is clear where the focus was-it was on the relationship between the insurance company and the policyholder. *Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws governing the "business of insurance."*

*Id.* at 460, 89 S.Ct. 564 (emphasis added).

Similarly, in *United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), the Supreme Court held that an Ohio priority statute was saved from preemption by the McCarran–Ferguson Act as a state statute enacted "for the purpose of regulating the business of insurance" because its purpose was to protect policyholders. *Id.* at 2212. The Court gave a

broad reading to this phrase, stating that any law with the "end, intention, or aim of adjusting, managing, or controlling the business of insurance" is a law "enacted for the purpose of regulating the business of insurance" for purposes of the McCarran–Ferguson Act. *Id.*

Based on this authority, both federal and state courts have held that state statutes that invalidate arbitration clauses *specifically as to insurance contracts* are indeed "enacted for the purpose of regulating the business of insurance" and thus not preempted by the FAA by virtue of the McCarran–Ferguson Act. *See Standard Security Life Ins. Co. v. West,* 267 F.3d 821, 823–24 (8th Cir. 2001) (holding that FAA was reverse-preempted under McCarran–Ferguson Act by provision of Missouri Arbitration Act prohibiting arbitration clauses in insurance contracts); *Stephens v. American Int'l Ins. Co.,* 66 F.3d 41, 45–46 (2d Cir.1995) (holding that anti-arbitration provision of Kentucky Liquidation Act was exempt from preemption by FAA under McCarran–Ferguson Act); *Mutual Reinsurance Bureau v. Great Plains Mutual Ins. Co., Inc.,* 969 F.2d 931, 934–35 (10th Cir.[1992]) (holding that Kansas statute providing that written agreement to arbitrate is invalid if contained in contract of insurance was enacted for purpose of regulating business of insurance and thus McCarran–Ferguson Act precluded application of FAA), *cert. denied,* 506 U.S. 1001, 113 S.Ct. 604, 121 L.Ed.2d 540 (1992); *Friday v. Trinity Universal of Kansas,* 262 Kan. 347, 939 P.2d 869, 872–73 (1997) (holding that McCarran–Ferguson Act prevented FAA from preempting Kansas statute invalidating arbitration clauses in insurance contracts; homeowners could not be compelled to arbitrate dispute with insurer).

The statutes at issue in the Eight and Tenth Circuit cases cited above are nearly identical to KRS 417.050, i.e., they provide a general rule of enforceability as to arbitration agreements but specifically exclude insurance contracts from their scope. Moreover, the rationale employed in those cases applies equally here: the Kentucky legislature has enacted a statute that is directed specifically at the relationship between the insurer and insured with the aim of protecting policyholders from mandatory arbitration agreements reached in the context of an adhesion contract. *See Buck Run* [*Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.*], 983 S.W.2d [501, 504 (Ky.1998)].

The only cases that appear to reach a contrary result involve either a *general* state anti-arbitration statute not dealing specifically with insurance, *see American Bankers Ins. Co. v. Crawford,* 757 So.2d 1125, 1131–33 (Ala.1999); involve such limited analysis as to be unpersuasive, *see Triton Lines, Inc. v. Steamship Mutual Underwriting Ass'n,* 707 F.Supp. 277, 279 (S.D.Tex.1989); or involve claims where the McCarran–Ferguson Act was not raised as a defense to the claim of FAA preemption, *see In re Transport Assoc., Inc.,* 263 B.R. 531, 533–34 (Bankr.W.D.Ky.2001).

*Id.* at 528–30.

Based on the preceding, we hold that the exemption from arbitration of insurance contracts contained in KRS 417.050 is not preempted by the FAA.

### 4. Does the Convention Require Arbitration?

Scott argues that because United Re AG is a foreign corporation, the parties to the Agreement are bound to follow the arbitration rules of the Convention. In sup-

port of his argument, Scott cites to 9 U.S.C. § 202, which states that:

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

█ We disagree with Scott for two reasons. First, the above federal statute does not preempt KRS 417.050 for the same reasons the FAA does not. 9 U.S.C. § 202, a federal statute, does not specifically relate to the business of insurance. KRS 417.050 was enacted for the purpose of regulating insurance, and application of 9 U.S.C. § 202 would invalidate and/or supersede KRS 417.050.

█ Second, 9 U.S.C. § 202 designates a corporation as a United States citizen if "it is incorporated or has its principal place of business in the United States." It is not disputed, at this point, that the United Re Entities, to the extent they both are incorporated, are incorporated in Switzerland and would fall within the Convention. However, that is only the first part of the definition. To the extent the United Re Entities' principal places of business are in the United States, they do not fall within the Convention.

Scott has not pointed us to a definition of "principal place of business" in the Convention, and we have not found one. Therefore, we use the definition that the federal courts apply to that term when determining diversity.

"[P]rincipal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

Hertz Corp. v. Friend, 559 U.S. 77, 130 S.Ct. 1181, 1192, 175 L.Ed.2d 1029 (2010).

Applying that definition herein, it is clear that the principal place of business of the United Re Entities is in the United States. During depositions in other cases involving Scott and the United Re Entities, Scott testified that all of the business of the United Re Entities was conducted from his law office in Texas. Furthermore, Scott testified that since 2004, he has been the sole employee and officer of the United Re Entities. Finally, Scott admitted that the United Re Entities only conducted business in the United States and the attorney in the "corporate headquarters" in Switzerland would know nothing about the United Re Entities or their business. Thus, it is clear that the "nerve center" or the principal places of business for the United Re Entities is the United States. Therefore, the United Re Entities are not covered by the Convention.

### 5. Remaining Issues

We note that Bedding argues that Scott waived his right to compel arbitration by

his litigation conduct in circuit court and that the arbitration provisions are not enforceable because they do not comply with the requirements set forth in *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451 (Ky. 2009). Because we have determined that the Agreement is an insurance contract and that the arbitration provisions are therefore not enforceable, we need not address those arguments and choose not to do so.

## CONCLUSION

The Agreement is an insurance contract. Therefore, pursuant to KRS 417.050, the arbitration provisions in the Agreement are not enforceable. Therefore, we affirm the circuit court's denial of Scott's motion to compel arbitration.

ALL CONCUR.