13-1163-cv
Wadsworth v. Allied Professionals

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2013

(Argued: February 3, 2014      Decided: April 4, 2014)

Docket No. 13-1163-cv

———————

RENATA WADSWORTH,

*Plaintiff - Appellant,*

— v. —

ALLIED PROFESSIONALS INSURANCE COMPANY, A RISK RETENTION GROUP, INC.,

*Defendant - Appellee.*

———————

B e f o r e:

LEVAL, CALABRESI and LYNCH, *Circuit Judges.*

———————

Plaintiff-appellant Renata Wadsworth sued defendant-appellee Allied

Professionals Insurance Company ("APIC"), a nondomiciliary risk retention

group, under New York's direct action statute, N.Y. Ins. Law § 3420, to recover an unsatisfied state court judgment that had been entered against APIC's insured. The United States District Court for the Northern District of New York (Norman A. Mordue, *Judge*) granted summary judgment to APIC finding that any construction of New York law that would impose § 3420's direct action requirement on foreign risk retention groups was preempted by the Liability Risk Retention Act of 1986 ("LRRA"), 15 U.S.C. § 3901, *et seq*. We hold that the LRRA preempts the application § 3420 to foreign risk retention groups.

AFFIRMED.

––––––––––––

MICHAEL C. PEREHINEC JR., Holmberg, Galbraith & Miller, LLP, Ithaca, New York, *for* Plaintiff-Appellant Renata Wadsworth.

RICK A. CIGEL (Michael B. Kadish, *on the brief*), The Cigel Law Group, P.C., Los Angeles, California, *for* Defendant-Appellee Allied Professionals Insurance Company, a Risk Retention Group, Inc.

Jeffrey B. Randolph, Law Offices of Jeffrey Randolph, Glen Rock, New Jersey, *for* Amicus Curiae National Risk Retention Association.

––––––––––––

GERARD E. LYNCH, *Circuit Judge*:

The federal Liability Risk Retention Act of 1986, 15 U.S.C. § 3901, *et seq.* ("the LRRA" or "the Act"), contains sweeping preemption language that sharply limits the authority of states to regulate, directly or indirectly, the operation of risk retention groups chartered in another state. Id. § 3902(a). A provision of New York's insurance law requires that any insurance policy issued in that state contain a provision permitting, under certain circumstances, an injured party with an unsatisfied judgment to maintain a direct action against her tortfeasor's insurer for the satisfaction of that judgment. N.Y. Ins. Law § 3420(a)(2). This case requires us to determine whether the LRRA preempts the application of § 3420(a)(2) to a risk retention group that is domiciled in Arizona, but issues insurance policies in New York. We hold that it does.

## BACKGROUND

In 2005, plaintiff-appellant Renata Wadsworth sought treatment from Dr. John Ziegler, an Ithaca, New York chiropractor. During her four visits with him, Ziegler repeatedly touched Wadsworth in an inappropriate, sexual manner without her consent. Wadsworth reported Ziegler's conduct to local authorities,

who arrested him. Ziegler later pled guilty to third-degree assault for his actions against Wadsworth.

Wadsworth subsequently filed a civil action against Ziegler seeking damages for emotional injury and lost income stemming from the sexual assault. Following a bench trial, the Supreme Court of Tompkins County, New York (M. John Sherman, *Judge*), entered a $101,175 judgment in Wadsworth's favor, which Ziegler failed to satisfy. Invoking N.Y. Ins. Law § 3420, and satisfying the conditions precedent of that provision, see infra p. 12, Wadsworth then sued defendant-appellee Allied Professionals Insurance Company ("APIC"), which was Ziegler's insurance carrier at the time of the sexual assault. APIC is registered in New York as a federal risk retention group,[1] and is recognized as such by the New York Department of Financial Services. Domiciled in Arizona, APIC has over 4,000 insureds in New York, including acupuncturists, chiropractors, and massage therapists.

---

[1] A risk retention group is a liability insurance company owned and operated by its members, and those members are its insureds. Risk retention groups offer commercial liability insurance for the mutual benefit of those owner-insureds, who must be exposed to similar risks and be members of the same industry. See 15 U.S.C. § 3901(a)(4).

APIC removed the case to the United States District Court for the Northern District of New York, and the parties cross-moved for summary judgment. In a Memorandum-Decision and Order, the district court (Norman A. Mordue, *Judge*) granted APIC's motion and denied Wadsworth's, concluding that any construction of New York law that would impose § 3420's direct action requirement on foreign risk retention groups was preempted by the LRRA.[2]

Wadsworth timely appealed, and upon de novo review of the district court's grant of summary judgment, Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 742 F.3d 17, 24 (2d Cir. 2014), we now affirm.

## DISCUSSION

Before turning to the preemption analysis, we briefly outline the history and structure of the various statutory schemes implicated by this case.

---

[2] The district court had earlier denied both motions with leave to renew, concluding that on the record then before it, it was "unable to determine with specificity how section 3420(a)(2) of the New York Insurance Law would affect the operation of risk retention groups and whether it would have sufficient impact on their operation to constitute direct or indirect regulation thereof." J.A. 509. The parties then filed renewed motions with additional supporting materials.

I.      The Liability Risk Retention Act of 1986[3]

Under the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, the business of

insurance is generally regulated by the states rather than the federal government.

In the late 1970s, however, Congress perceived a seemingly unprecedented crisis

in the insurance markets, during which many businesses were unable to obtain

product liability coverage at any cost.  And when businesses could obtain

coverage, their options were unpalatable.  Premiums often amounted to as much

as six percent of gross sales, and insurance rates increased manyfold within a

single year.  See Home Warranty Corp. v. Caldwell, 777 F.2d 1455, 1463 (11th Cir.

1985).

After several years of study, Congress enacted the Product Liability Risk

Retention Act of 1981 ("the 1981 Act"),[4] which was meant to be a national

response to the crisis.  As relevant here, the 1981 Act authorized persons or

businesses with similar or related liability exposure to form "risk retention

---

[3] We have previously discussed the history of the LRRA in two opinions.  See
Preferred Physicians Mut. Risk Retention Grp. v. Pataki, 85 F.3d 913, 914 (2d Cir.
1996)[hereinafter "Preferred Physicians"]; Ins. Co. of Pa. v. Corcoran, 850 F.2d 88,
89-90 (2d Cir. 1988).

[4] For an exhaustive history of the 1981 Act, see Home Warranty Corp., 777 F.2d at
1456-79.

groups" for the purpose of self-insuring. 15 U.S.C. § 3901(a)(4). The 1981 Act

only applied to product liability and completed operations insurance, but

following additional disturbances in the interstate insurance markets, in 1986,

Congress enacted the LRRA, and extended the 1981 Act to all commercial liability

insurance. See 15 U.S.C. §§ 3901-3906 (1982 & Supp. IV 1986); Preferred

Physicians, 85 F.3d at 914. At the time of the LRRA's passage, however, most

states, exercising their traditional power over the business of insurance, did not

permit such risk retention groups. Preferred Physicians, 85 F.3d at 914.

Rather than enacting comprehensive federal regulation of risk retention

groups, see Corcoran, 850 F.2d at 91, Congress enacted a reticulated structure

under which risk retention groups are subject to a tripartite scheme of concurrent

federal and state regulation. First, at the federal level, the Act preempts "any

State law, rule, regulation, or order to the extent that such law, rule, regulation or

order would . . . make unlawful, or regulate, directly or indirectly, the operation

of a risk retention group," 15 U.S.C. § 3902(a)(1), language that we have

previously described as "expansive," Preferred Physicians, 85 F.3d at 915, and

"sweeping," Corcoran, 850 F.2d at 91.

That preemption is not universal. The second part of the scheme secures

7

the authority of the domiciliary, or chartering, state to "regulate the formation and operation" of risk retention groups. 15 U.S.C. § 3902(a)(1). Federal preemption, therefore, functions not in aid of a comprehensive federal regulatory scheme, but rather to allow a risk retention group to be regulated by the state in which it is chartered, and to preempt most ordinary forms of regulation by the other states in which it operates. Thus, the Act "provides for broad preemption of a non-domiciliary state's licensing and regulatory laws." Fla., Dep't of Ins. v. Nat'l Amusement Purchasing Grp., Inc., 905 F.2d 361, 363-64 (11th Cir. 1990). Similarly, the Act prohibits states from enacting regulations of any kind that discriminate against risk retention groups or their members, but does not exempt risk retention groups from laws that are generally applicable to persons or corporations. 15 U.S.C. § 3902(a)(4).

While the Act assigns the primary regulatory supervision of risk retention groups to the single state of domicile, the third part of its regulatory structure "explicitly preserves for [nondomiciliary] states several very important powers." Fla., Dep't of Ins., 905 F.2d at 364. The Act specifically enumerates those reserved powers in subsequent subsections, with many powers of the nondomiciliary state being concurrent with those of the chartering state. See 15 U.S.C.

8

§§ 3902(a)(1)(A)-(I), 3905(d).  In particular, subject to the Act's anti-discrimination provisions, nondomiciliary states have the authority to specify acceptable means for risk retention groups to demonstrate "financial responsibility" as a condition for granting a risk retention group a license or permit to undertake specified activities within the state's borders.  15 U.S.C. § 3905(d).  Additionally, any state may, after an investigation of the group's financial condition, commence a delinquency proceeding.  15 U.S.C. § 3902(a)(1)(F)(i).[5]  Any state may also require a risk retention group to comply with any order resulting from such an investigation, or from a voluntary dissolution proceeding.  15 U.S.C. § 3902(a)(1)(F)(i)-(ii).  In short, as compared to the near plenary authority it reserves to the chartering state, the Act sharply limits the secondary regulatory authority of nondomiciliary states over risk retention groups to specified, if significant, spheres.

---

[5] Underscoring that primary regulatory and enforcement authority rests with the chartering state, a nondomiciliary state may not initiate an investigation of a risk retention group unless the chartering state declines to do so.  15 U.S.C. § 3902(a)(1)(E)(i)-(ii).

II.     New York Insurance Law

        A.      General Provisions

New York Insurance Law, as it pertains to risk retention groups, largely mirrors the structure of federal law.  Article 59 of the New York Insurance Law expressly recognizes the limits imposed by the LRRA, noting that its purpose is "to regulate the formation and/or operation . . . of risk retention groups . . . formed pursuant to the provisions of the federal Liability Risk Retention Act of 1986, to the extent permitted by such law."  N.Y. Ins. Law § 5901 (internal citation omitted).  In keeping with those limits, New York cleanly distinguishes between the broad regulatory authority it exercises over those risk retention groups that seek to be chartered in New York, and the more limited regulations it is permitted to adopt with respect to nondomiciliary risk retention groups.  Section 5903, entitled "Domestic risk retention groups," commands that such groups "shall comply with *all* of the laws, regulations and orders applicable to property/casualty insurers organized and licensed in this state," id. § 5903(a) (emphasis added).  In contrast, § 5904, applicable to "[r]isk retention groups not chartered in [New York]," requires that such groups "comply with the laws of [New York]" set out in ten subsequent subsections, largely tracking the powers

10

reserved to nondomiciliary states by 15 U.S.C. § 3902(a)(1)(A)-(I).  Those ten

subsections do not include the provisions of New York law that are at issue in

this case, N.Y. Ins. Law §§ 3420(a)(2) & (b)(1), or indeed any part of § 3420.

B.        New York Insurance Law § 3420

Section 3420(a)(2), in its current form, was codified in 1918 and has

remained unchanged ever since.  See Richards v. Select Ins. Co., 40 F. Supp. 2d

163, 168 (S.D.N.Y. 1999).[6]  In derogation of the common law, § 3420 vests a

substantive right in an injured party against a tortfeasor's insurer.  See State

Trading Corp. of India Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 416 (2d

Cir. 1990) (noting that a direct action statute is substantive); accord Lang v.

Hanover Ins. Co., 3 N.Y.3d 350, 354 (2004) (noting that § 3420(a)(2) remedied

"inequity" of common law "by creating a limited statutory cause of action on

behalf of injured parties directly against insurers").

Section 3420 requires that every insurance policy issued in New York

contain, among other required provisions, a provision "that the insolvency or

bankruptcy of the person insured, or the insolvency of the insured's estate, shall

_____

[6] A previous version of the direct action statute permitted the injured party to sue
the insurer before obtaining a judgment against the insured.  See Richards, 40 F.
Supp. 2d at 168, citing 1917 N.Y. Laws ch. 524.

not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract." N.Y. Ins. Law § 3420(a)(1). It further authorizes "any person who . . . has obtained a judgment against the insured . . . for damages for injury sustained or loss or damage occasioned during the life of the policy or contract" to maintain an action against the insurer "[s]ubject to the limitations and conditions of paragraph two of subsection (a) of this section." Id. § 3420(b)(1). Subsection (a)(2) states: "in case judgment against the insured . . . shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may . . . be maintained against the insurer." Id. § 3420(a)(2).

In short, § 3420 grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances – the injured party must first obtain a judgment against the tortfeasor, serve the insurance company with a copy of the judgment, and await payment for 30 days. Compliance with those requirements is a condition precedent to a direct action against the insurance company. Lang, 3 N.Y.3d at 355.

Given the foregoing, there is a strong argument that as a matter of New York law, § 3420 simply does not apply to foreign risk retention groups. Section 5904 lists the specific laws and requirements with which foreign risk retention groups must comply; that list does not include any portion of § 3420. Section 5904, moreover, largely mirrors 15 U.S.C § 3902(a), which explicitly reserves specific regulatory authority of the states over nondomiciliary risk retention groups; those sections themselves do not require the inclusion of a direct action provision in such insurance contracts or expressly authorize nonchartering states to do so. Because the declared intention of New York is to regulate risk retention groups to the extent permitted by federal law, N.Y. Ins. Law § 5901, we are inclined to believe that New York did not intend § 3420 to apply to risk retention groups chartered in another state.

We are unaware, however, of any decision of a New York court so holding, and we refrain from relying unnecessarily on that ground. The question presented by this appeal, and to which we now turn, is whether the LRRA preempts application of § 3420(a)(2) to foreign risk retention groups. We hold that any construction of New York law that would impose § 3420's direct action requirements on foreign risk retention groups is preempted by § 3902(a)(1) of the LRRA.

III.    Preemptive Effect of the LRRA

A.    General Preemption Principles

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. From that constitutional principle, it follows, that when acting within the scope of its enumerated powers, Congress may preempt state law. In re MTBE Prods. Liability Litig., 725 F.3d 65, 96 (2d Cir. 2013). Despite its importance, the preemption power is "sensitive," id., and when "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," Wyeth v. Levine, 555 U.S. 555, 565 (2009) (internal quotation marks and alterations omitted). Further, "state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." United States Dep't of Treasury v. Fabe, 508 U.S. 491, 507 (1993), quoting 15 U.S.C. § 1012(b).

14

B.     Language and Structure of the LRRA

Even given the general presumption, specifically reinforced by the McCarran-Ferguson Act,[7] that insurance regulation is generally left to the states, the language and purpose of the LRRA clearly announce Congress's explicit intention to preempt state laws regulating risk retention groups.  Section 3902 of the LRRA provides, in relevant part, that

> (a) Except as provided in this section, a risk retention group is exempt from *any* State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would –
>> (1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group . . . .

15 U.S.C. § 3902(a)(1) (emphasis added).[8]

---

[7] "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of [insurance] by the several States."  15 U.S.C. § 1011.

[8] The section goes on additionally to preempt state legislation that would

> (2) require or permit a risk retention group to participate in any insurance insolvency guaranty association to which an insurer licensed in the State is required to belong;

> (3) require any insurance policy issued to a risk

Section 3902(a)(1) then goes on to provide general authority for "the jurisdiction in which it is chartered [to] regulate the formation and operation of such a group." Id. In stark contrast, the Act authorizes nonchartering states to require risk retention groups to comply only with certain basic registration, capitalization, and taxing requirements, as well as various claim settlement and fraudulent practice laws. See 15 U.S.C. § 3902(a)(1)(A)-(I).

It is undisputed that APIC is a risk retention group formed and functioning under the LRRA and that it is domiciled in Arizona. Therefore, § 3902(a)(1), insofar as it relates to the powers of nondomiciliary states, governs the authority of New York to impose regulations on APIC's operations in New York. Further, Wadsworth does not argue that New York's direct action provision falls within the ambit of the specific exceptions from preemption set forth in subsections

retention group or any member of the group to be countersigned by an insurance agent or broker residing in that State; or

(4) otherwise, discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.

15 U.S.C. § 3902(a)(2)-(4).

16

3902(a)(1)(A)-(I).[9]  Instead, she argues for a narrow construction of the

preemption provision itself.  Reasoning that Congress was concerned with

"discrimination by the states against alternative insurance providers,"

Wadsworth contends that Congress's main purpose in passing the Act "was to

ensure further state discrimination would not occur." Appellant Br. 15.  On this

reading of the LRRA, N.Y. Ins. Law § 3420 would be a generally applicable,

nondiscriminatory statute that does not conflict with or frustrate 15 U.S.C.

§ 3902(a)(1), and is therefore not preempted.

The LRRA's language and structure, however, as well as our prior

decisions, render Wadsworth's reading of the statute untenable.  Plainly,

§§ 3902(a)(2) and (3) are not directed toward placing risk retention groups "on

equal footing" with traditional insurers.  To the contrary, both of those provisions

excuse risk retention groups from certain requirements that states may and

typically do impose upon insurers licensed within that state.  Moreover,

---

[9] Such an argument would be implausible.  The highly specific and limited
exceptions to preemption under that provision support the conclusion that if
Congress had intended to exempt direct action statutes from preemption, it
would have said so.  See United States v. Smith, 499 U.S. 160, 167 (1991) ("Where
Congress explicitly enumerates certain exceptions to a general prohibition,
additional exceptions are not to be implied, in the absence of evidence of a
contrary legislative intent.") (internal quotation marks omitted).

§ 3902(a)(4) expressly prohibits discrimination against risk retention groups. If

the entire purpose of the preemption provision was solely to invalidate

*discriminatory* state laws, Congress could have enacted a far less complex statute

that simply adopted the language of subsection (a)(4) without more, and thus

prohibited all state laws, and only those, that discriminate against risk retention

groups. Instead, however, Congress specifically preempted "*any*" law, rule, or

regulation by a nondomiciliary state that would "regulate, directly or indirectly,

the operation of a risk retention group." 15 U.S.C. § 3902(a)(1) (emphasis added).

A clearer prohibition would be hard to devise. The express preemption of *any*

regulation simply cannot be read as preemption only of *discriminatory*

regulation.[10]

For these reasons, we have read the LRRA's preemption language broadly.

In enacting the LRRA, we have held, Congress desired "to decrease insurance

_____

[10] Wadsworth argues that inclusion of the word "otherwise" in § 3902(a)(4) implies that the provisions that precede it must also be limited to regulation that discriminates. But such a reading fails. Wadsworth does not explain, for example, how § 3902(a)(2), which would also be affected by her reading, could coherently be limited only to discriminatory laws; that provision expressly prohibits subjecting risk retention groups to a requirement identical to that imposed on other insurers. The weak implication from the word "otherwise," in any event, cannot trump the broad express language of § 3902(a)(2)'s prohibition of *any* regulation of risk retention groups by nondomiciliary states.

rates and increase the availability of coverage by promoting greater competition within the insurance industry." Preferred Physicians, 85 F.3d at 914, citing H.R. Rep. No. 99-865, 1986 U.S.C.C.A.N. 5303, 5304-06.[11] "[T]he legislative history of the Act makes clear that Congress intended to exempt [risk retention groups] broadly from state law 'requirements that make it difficult for risk retention groups to form or to operate on a multi-state basis.'" Id. at 915-16, citing 1986 U.S.C.C.A.N. 5303, 5305.[12] An expansive reading of the preemption language furthers the Act's purpose. Id. at 915.

---

[11] See also Ophthalmic Mut. Ins. Co. v. Musser, 143 F.3d 1062, 1067 (7th Cir. 1998) ("Congress enacted the PLRRA (and, later, the LRRA) because it felt that the tangle of myriad state regulations choked off RRGs . . . ."); Mears Transp. Grp. v. State of Fla., 34 F.3d 1013, 1017 (11th Cir. 1994) (noting that purpose of preemption provisions was to facilitate "the efficient operation of risk retention groups by eliminating the need for compliance with numerous non-chartering state statutes that, in the aggregate, would thwart the interstate operation [of] product liability risk retention groups"), quoting H.R. Rep. No. 190, 97th Cong. 1st Sess. 12 (1981), reprinted in 1981 U.S.C.C.A.N. 1432, 1441.

[12] Our sister circuits have similarly recognized the breadth of the LRRA's preemption provisions. See, e.g., Nat'l Warranty Ins. Co. RRG v. Greenfield, 214 F.3d 1073, 1077 (9th Cir. 2000) ("[Section] 3902(a) plainly preempts most regulation of RRGs by non-chartering states."); Ophthalmic Mut., 143 F.3d at 1067 (finding preemptive language of § 3902(a) "explicit"); Nat'l Amusement Purchasing Grp., Inc., 905 F.2d at 363 (noting that Act's "sweeping preemption language," largely preempts "the authority of non-domiciliary states to license and regulate risk retention groups").

19

C.     Effects of Applying § 3420(a)(2) to Foreign Risk Retention Groups

The effects that application of N.Y. Ins. Law § 3420(a)(2) would have on nondomiciliary risk retention groups further buttress our conclusion.  That section, which is in derogation of the common law, allows an injured party with an unsatisfied judgment against an insured party to sue the insurer for satisfaction of the judgment in some circumstances.  Cont'l Ins. Co v. Atl. Cas. Ins. Co., 603 F.3d 169, 174 (2d Cir. 2010); Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 353-54 (2004).[13]  "The effect of the statute is to give to the injured claimant a cause

---

[13] Section 3420(a) requires all New Your insurance contracts to "contain[] in substance the following provision or provisions that are equally or more favorable to the insured and to judgment creditors so far as such provisions relate to judgment creditors . . .

> (2) A provision that in case judgment against the insured . . . in an action brought to recover damages for injury sustained or loss or damage occasioned during the life of the policy or contract shall remain unsatisfied at the expiration of thirty days from the serving of notice of entry of judgment upon the attorney for the insured, or upon the insured, and upon the insurer, then an action may . . . be maintained against the insurer under the terms of the policy or contract for the amount of such judgment not exceeding the amount of the applicable limit of coverage under such policy or contract.

N.Y. Ins. Law § 3420(a).  Section 3420 also contains provisions regarding notice, insolvency or bankruptcy of the insured, and the insurer's right or obligation to bring a declaratory judgment action.

20

of action against an insurer for the same relief that would be due to a solvent principal seeking indemnity and reimbursement after the judgment had been satisfied." Lang, 3 N.Y.3d at 354-55 (internal quotation marks and alteration omitted). Although the statute does not increase the amount of the insurer's liabilities, the rights of the injured party are independent of the rights of the insured, and in some circumstances, more favorable. See Cont'l Ins., 603 F.3d at 176 ("Th[e] separate standard, used to determine the reasonableness of the injured party's notice, is more lenient than the standard for the insured party's notice.").

Application of those provisions to APIC or to any other foreign risk retention group would undoubtedly "regulate, directly or indirectly," those groups by subjecting them to lawsuits filed in New York by claimants who are not parties to APIC's contracts with insureds. 15 U.S.C. § 3902(a)(1). The cost of litigation might well result in higher attorneys' fees, costs, and potential recoveries. Moreover, § 3420(a)(2) is not simply a rule of civil procedure. It specifically governs the content of insurance policies, requiring insurers to place in their New York contracts a provision that is not contemplated by the LRRA, and that is not required by all other states. Application of the statute would

21

therefore make it difficult for a foreign risk retention group to maintain uniform underwriting, administration, claims handling, and dispute resolution processes. A substantial portion of state insurance regulation consists of such standardized requirements for the content of insurance policies, which vary from state to state. A major benefit extended to risk retention groups by the LRRA is the ability to operate on a nationwide basis according to the requirements of the law of a single state, without being compelled to tailor their policies to the specific requirements of every state in which they do business. Requiring compliance with various state regulations governing the content of insurance policies would, in the aggregate, thwart the efficient interstate operation of risk retention groups. See Mears Transp. Grp., 34 F.3d at 1017.

Wadsworth relies on two decisions, National Home Insurance Co. v. King, 291 F. Supp. 2d 518 (E.D. Ky. 2003), and Sturgeon v. Allied Professionals Insurance Co., 344 S.W.3d 205 (Mo. Ct. App. 2011), neither binding on us, to support her argument that application of § 3420(a)(2) would not affect the interstate operation of risk retention groups.[14] In both of those cases, the state

_____

[14] Wadsworth also cites an opinion of the New York General Counsel that determined that nondomiciliary risk retention groups offering medical malpractice policies have claim reporting obligations under N.Y. Ins. Law

statutes at issue proscribed mandatory arbitration of disputes arising from insurance contracts.  See Nat'l Home, 291 F. Supp. 2d at 524, quoting Ky. Rev. Stat. Ann. § 417.050; Sturgeon, 344 S.W.3d at 210, quoting Mo. Rev. Stat. § 435.350.  In both cases, the courts found that as a general matter, the Federal Arbitration Act, 9 U.S.C. § 2, preempted state anti-arbitration laws.  Both courts also found, however, that the McCarran-Ferguson Act "reverse preempted" the anti-arbitration provisions.  Nat'l Home, 291 F. Supp. 2d at 528; Sturgeon, 344 S.W. 3d at 212.

The McCarran-Ferguson Act precludes the application of a federal statute in the face of state law "enacted . . . for the purpose of regulating the business of insurance," if the federal measure does not "specifically relat[e] to the business of

---

§ 315(b)(1).  See N.Y. Gen. Counsel Op. 7-26-2007, No. 2.  That statutory provision, which requires each insurance company engaged in issuing professional medical malpractice insurance to file quarterly reports on all claims for medical malpractice made against any of its insureds, is quite different from § 3420(a)(2).  The General Counsel's opinion did not consider the application of § 3420(a)(2) to nondomiciliary risk retention groups.  We express no views on the merits of that opinion which, in any event, does not bind this Court.  We note, however, that in light of the retained authority of nondomiciliary states to monitor the financial condition of nondomiciliary risk retention groups and to require those groups to comply with state regulation regarding unfair claim settlement practices, 15 U.S.C. §§ 3902(a)(1)(A), (G), it is doubtful that such quarterly reporting requirements are preempted as "regulating, directly or indirectly, the operation of a risk retention group," id. § 3902(a)(1).

insurance," and would "invalidate, impair, or supersede" the state's law.  See

Fabe, 508 U.S. at 500-01.  The courts Wadsworth relies upon found all three of

those considerations satisfied because the FAA is not a statute that specifically

relates to the business of insurance, and therefore did not preempt statute anti-

arbitration laws to the extent that such provisions were enacted to regulate the

business of insurance.

To that extent, the National Home and Sturgeon decisions are inapposite.

Both opinions further ruled, however, that the LRRA did not preempt the state

law rules in question.  Insofar as those decisions relied on an interpretation of the

LRRA that differs from ours, we disagree.  The LRRA is, without question, a

federal statute that specifically relates to the business of insurance.  Section

3420(a)(2), which, to reiterate, requires any insurance policy issued in the state of

New York to contain a provision permitting a direct action against a tortfeasor's

insurer, was undoubtedly enacted to regulate the business of insurance.  In

sweeping preemption language, subject to certain limited exceptions, Congress

chose to limit the power of nondomiciliary states to regulate risk retention

groups.  The McCarran-Ferguson Act does not save § 3420(a)(2) from the LRRA's

preemptive sweep.

**CONCLUSION**

We conclude that any construction of N.Y. Ins. Law § 3420(a)(2) that permits its application to risk retention groups chartered in another state is preempted by the LRRA. The judgment of the district court is AFFIRMED.